Francisco PATINO

v.

DALLAS INDEPENDENT SCHOOL
DISTRICT.

Civ. A. No. 3–76–0599–C.

United States District Court,
N. D. Texas,
Dallas Division.

March 21, 1980.

Frank P. Hernandez, Hernandez, Inc., Garland, Tex., for plaintiff.

E. Lee Haag, III, Bowen L. Florsheim, Frederic Gover, Smith, Smith, Dunlap & Canterbury, Dallas, Tex., for defendant.

## MEMORANDUM OPINION

WILLIAM M. TAYLOR, Jr., District Judge.

This is an action under Title VII of the Civil Rights Act of 1964, as amended (42 U.S.C. § 2000e, et seq.) in which Plaintiff, Francisco Patino, claims that his contract as a teacher in Defendant Dallas Independent School District (hereafter DISD) was not renewed because of Plaintiff's national origin, i. e., Mexican-American. Defendant contends that Plaintiff's probationary contract was not renewed because of Plaintiff's failure to pay proper attention to his classroom teaching duties, because of Plaintiff's inability to work in harmonious relationship with peers and superiors, and because of conflicts between Plaintiff and students.

### I. *Findings of Fact*

Generally, there is no dispute as to the background facts leading to Plaintiff's last year of employment by DISD. Prior to Plaintiff's employment with DISD, he was certified to teach music in Texas and taught various music courses in the San Diego, Texas, Independent School District, in the Wainwright, Texas, Consolidated School District, and in the El Paso, Texas, Independent School District.

In 1970 Plaintiff applied for a position as a music teacher in DISD and was hired under a probationary contract to begin with the opening of the 1970–71 school year. All teachers who are new to the DISD are employed under a maximum of three (3) successive one year probationary contracts terminable at will by DISD. The purpose of the probationary contract policy is to give DISD an opportunity to judge the actual classroom performance of a teacher.

During the 1970–71 school year, Plaintiff was assigned to Alex W. Spence Junior High School. During that school year he taught various beginning and advanced band courses. The principal of Spence that year was Dr. John Allen, who performed all day-to-day supervisory functions over Plaintiff's teaching activities. Pursuant to normal evaluation procedures, Dr. Allen rated Plaintiff overall "good" for the 1970–71 school year and recommended him for re-employment. Plaintiff was offered a second probationary contract to begin with the 1971–72 school year.

During the 1971–72 school year, Plaintiff was re-employed on a probationary contract and was reassigned to Spence in the same capacity. During that school year, Plaintiff's principal and supervisor was Arvo Goddard. As will be set out in more detail below, Plaintiff's classroom performance as a teacher and his relations with his peers and superiors at Spence deteriorated drastically during the 1971–72 school year. Despite repeated counseling and attempts at assistance by Mr. Goddard and others from the administration, Plaintiff's performance did not improve sufficiently during the latter part of the school year to justify his retention. He was not offered a third probationary contract and his employment with DISD terminated automatically at the end of his contract for the 1971–72 school year.

Plaintiff appealed the decision not to offer him a new contract through the administrative procedures of the DISD. Pursuant to DISD procedures, Plaintiff received formal evidentiary hearings before an Administrative Council of the DISD and subsequently before the full Board of Trustees of DISD. Both of these bodies affirmed the decision of the Administration. It is significant that at no time during these proceedings did Plaintiff raise any issue as to national origin or any form of discrimination claim.

At this point it is to be noted that Plaintiff's claims that he was active in the Mexican-American community have never been disputed by DISD. Neither did the DISD deny that Plaintiff's activities had a connection in this case and played a part in Plaintiff's declining performance as a teacher. However, Plaintiff's activities in the Mexican community, as such, formed no part of any action by the DISD. Those activities were an issue only because Plaintiff allowed them to override his professionalism as a teacher. Plaintiff's activities became a shield to excuse his inability to get along with his superiors, peers and students, his declining classroom performance, and his insubordination to his superiors.

It is difficult to present the significant events at Spence during the 1971-72 school year in a cohesive and chronological manner because many of them overlap in various ways. Therefore, the Court will discuss the significant events and matters which led to Plaintiff's termination in three distinct categories: job performance as a whole, relations with the administration and students at Spence, and insubordination to superiors.

## A. Plaintiff's Job Performance

Mr. Arvo Goddard, the principal at Spence, was the individual charged with evaluating Plaintiff's job performance as a music instructor. Mr. Goddard holds a graduate degree in music and for many years instructed music in the DISD and elsewhere. He therefore is well aware of what can be expected from a music instructor and what can be expected from the students of that instructor given varying degrees of competence in education.

At various times throughout the school year Mr. Goddard had opportunities to observe the classes being conducted by Plaintiff, the teaching techniques being used by Plaintiff, and the performance of students in Plaintiff's classes. Mr. Goddard testified that Plaintiff was not paying proper attention to his classes and was performing work on outside projects, leaving his students unattended.

Mr. Goddard also testified that based on his personal observations of Plaintiff's performance, Plaintiff was not using proper teaching techniques. Mr. Goddard (and indeed, the Defendant in this case) did not take the position that Plaintiff didn't know proper techniques, but, rather, that during the school year in question, Plaintiff did not use those techniques. Plaintiff's poor techniques, lack of planning and control, and general inattention to duty created an atmosphere which was not conducive to learning.

Finally, Mr. Goddard personally taught Plaintiff's classes while Plaintiff was in Mexico for a three day trip, and he had an opportunity to observe the progress of the students taught by Plaintiff. He found that the students were not properly motivated, and, more importantly, were showing very poor progress in learning even the most basic elements of music.

All of these points were the subject of conversation and counseling between Mr. Goddard and Plaintiff, but no improvements were made. Indeed, it was established that Plaintiff failed to use the extra time made available to him both before and after school to teach his students, and throughout the year Plaintiff's duties as a band instructor took a clear second place to outside activities.

Plaintiff did not deny that his responsibilities to his students were taking second place to his outside, extracurricular activities. When Plaintiff was faced with his evaluation by Mr. Goddard in February, 1972, he himself wrote in response to Mr. Goddard's statements concerning his poor performance the following comment:

"It would have been superior if I was rating myself on the Mexican-American music project. In Spanish we say "El que mucho abarca poco aprieta'. One or the other had to suffer."

Plaintiff's lack of proper classroom performance was confirmed by the testimony of Mr. William A. Morgan. As with Mr. Goddard, Mr. Morgan holds advanced degrees in Music Education and is an experienced band and music instructor in various

environments. As part of Mr. Morgan's duties, he made roving inspections of campuses to study the status of music instruction. Early in 1971–72 school year he visited Spence and observed Plaintiff in action. He observed that Plaintiff was giving little real instruction to the students and that when Plaintiff was instructing part of one class, he left the remainder of the class totally unattended and doing nothing. Mr. Morgan discussed this inappropriate teaching method with Plaintiff.

During a later visit Mr. Morgan observed one of Plaintiff's beginning band classes. The band class had been split into small groups, and each was performing at its own pace on its own instruments at the same time. The cacophony of noises made it impossible for students to hear and discriminate sounds. In Mr. Morgan's opinion, such a technique is dangerous, especially for beginning classes and especially when conducted in a small band room with relatively poor accoustics. Mr. Morgan also observed on at least two visits during the school year in question that Plaintiff was in a back room conducting other business while the students were on their own, receiving no instruction.

In addition, it was established that Plaintiff failed to encourage students to enter any of the festivals established by DISD for music students. It was only after much prodding by Mr. Goddard and Mr. Morgan that Plaintiff entered any students in these activities. In fact, Plaintiff actively discouraged them from participation, telling them that they were not competent to compete. The festivals are conducted in such a way as to eliminate any direct comparisons between students; each student is graded and considered on the basis of his or her performance at his or her level of activity. Both Mr. Goddard and Mr. Morgan soundly condemned Plaintiff's refusal to encourage his students and his open denigration of their ability.

This testimony, as well as the testimony of Ms. Hudie Mae Oakey and others, establishes that during the school year in question Plaintiff consciously let his classroom performance slip in favor of outside activities which were wholly extracurricular in nature. It was the failure of Plaintiff to perform his duties in a proper professional manner that was the major factor in the recommendation of Mr. Goddard not to recommend Plaintiff for reemployment, and in the decision of the DISD not to renew his contract.

## B. Relations With Students

During the 1971–72 school year several black students demanded a transfer from Plaintiff's band and music course. They complained that Plaintiff had made derogatory remarks concerning the body odor of black students and had otherwise insulted them because of their race. Mr. Rufus Newhouse, a guidance counselor, investigated the students' charges and determined that there was reason to believe them and granted their transfer requests.

The instance of the derogatory comments and the fact that Plaintiff had a very serious problem keeping black students in his classes caused Mr. Goddard to rate Plaintiff as unacceptable in the area of pupil-teacher relationships.

## C. Insubordination and Unprofessional Conduct

At the beginning of the school year and again at a later date Plaintiff was instructed by Mr. Goddard to collect insurance fees on instruments in accordance with standard DISD practice. Plaintiff protested collection of the fees, but was instructed to collect the fees nevertheless. Plaintiff did not collect or pay any fees to the DISD as required by these policies.

On another occasion, Plaintiff intentionally disobeyed the orders of Mr. Goddard to discard old and useless band uniforms. Likewise, Plaintiff failed to carry out instructions from Mr. Goddard that the sheet music be properly stored and that Plaintiff's band room be kept in good condition.

Finally, Plaintiff exhibited insubordination of his superiors in the situation involving Yolanda Barrera, a teacher at Spence.

Mr. Goddard was required by the school administration to eliminate one teaching position due to a reduction in the number of students at Spence. Because Yolanda Barrera was teaching a series of courses which could be eliminated without having to modify the schedules of a large number of students, and because the courses she taught were not "core" courses, he selected her position and eliminated her duties. Due to a foul-up at the DISD administrative office, she was not transferred to another school for approximately one semester. She was still paid as a teacher but was left in administrative limbo. Plaintiff used the Barrera situation as a point of constant complaint. Several times he caused what amounted to a confrontation between Mr. Goddard and him concerning Yolanda Barrera, claiming he was speaking for Ms. Barrera and the Mexican-American community. On Mr. Goddard's investigation, it turned out that Plaintiff spoke for no one but himself. Finally Mr. Goddard told Plaintiff to mind his own business, get back to teaching and leave the administration of the schools to those who were employed to administrate. Instead, Plaintiff continued his activities as a defender of Yolanda Barrera (who never asked for such defense) and Plaintiff attempted to create constant friction between Mr. Goddard and other teachers over this point.

All of this amounts to a picture of a probationary, second year teacher attempting to interject himself directly into the administration of a school and a school district. As an excuse for such activities, Plaintiff is now flaunting his Mexican-American background, although that background had nothing whatsoever to do with Plaintiff's teaching duties and his failure to carry out those duties.

## D. Other Considerations

In addition to the evidence concerning the reasons for Plaintiff's non-renewal, the evidence established certain other points which are significant in the context of this case. First, the evidence establishes that throughout Mr. Goddard's tenure as a principal at Spence there were other teachers of Mexican-American descent under his supervision and control. The evidence establishes that Mr. Goddard gave many of those teachers superior ratings, recommended at least one for promotion, and did not find it necessary to terminate any other Mexican-American teachers. In addition, Mr. Goddard did find it necessary to give conditional or unacceptable ratings to Anglo teachers and Black teachers.

A final point is that Plaintiff had two Administrative Hearings before his non-renewal became final. The first hearing was before an Administrative Council of the DISD, a panel composed of three administrators unrelated to the case, and the second hearing was a de novo hearing before the full Board of Trustees of the DISD. In both hearings, Plaintiff was represented by competent counsel, had a right to cross-examine witnesses produced by the Administration, and had a right to present his own witnesses and other documentary evidence. Both of these bodies, after what amounted to full adversary trials, found that Plaintiff had not properly performed his duties as a teacher in the DISD. In neither hearing did Plaintiff or his attorney suggest that national origin or other discrimination was the basis for the non-renewal of his contract.

## II. Conclusions of Law

The order of proof in any discrimination case is divided into three basic categories. First, the plaintiff must prove, by a preponderance of the evidence, a prima facie case that the acts complained of were caused by discrimination of some kind. If plaintiff is able to prove a prima facie case, then the burden of coming forward and *enunciating* a legitimate non-discriminatory reason for its actions is shifted to the defendant. *McDonnell Douglas Corporation v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); *Furnco Construction Co. v. Waters*, 438 U.S. 567, 98 S.Ct. 2943, 57 L.Ed.2d 957 (1978); *Board of Trustees of Keene State College v. Sweeney*, 439 U.S. 24, 99 S.Ct. 295, 58 L.Ed.2d 216 (1978).

Most significantly, a defendant does not have to prove non-discrimination nor does it have to "rebut" or "disprove" the plaintiff's prima facie case (if proved). As stated by the Supreme Court in its decision in *Board of Trustees of Keene State College v. Sweeney, supra* :

> "We quite agree with the dissent that under *Furnco* and *McDonnell Douglas* the employer's burden is satisfied if he 'simply explains what he has done' or 'produc[es] evidence of legitimate nondiscriminatory reasons' (citations omitted) but petitioners clearly did produce evidence to support their legitimate nondiscriminatory explanation for refusing to promote respondent during the years in question (citations omitted). Nonetheless, the Court of Appeals held that petitioners had not met their burden because the proffered legitimate explanation did not 'rebut' or 'disprove' respondent's prima facie case or 'prove absence of nondiscriminatory motives.'" (99 S.Ct. at 296n2)

The Court went on to state that the Court of Appeals had in fact imposed a heavier burden of proof on the defendant than the law permitted. Even the dissent in the *Board of Trustees* case agreed with the majority on this particular point stating:

> "On that question—as all of these cases make perfectly clear—it is only the burden of producing evidence of legitimate nondiscriminatory reasons which shifts to the employer; the burden of persuasion, as the Court of Appeals properly recognized, remains with the plaintiff." (99 S.Ct. at 298)

Once a defendant has enunciated legitimate non-discriminatory reasons for its actions, the third element of the trinity of proof comes into play. At that point the burden is shifted back to the plaintiff to prove by a preponderance of the evidence that the reasons brought forth by a defendant were a pretext for its actions. *McDonnell Douglas Corp. v. Green, supra*. Again, as always, the burden of proof and persuasion is on the plaintiff and not the defendant.

Taking these three elements, one at a time, it is apparent that Plaintiff's case is without merit. First, Plaintiff failed to reach the first plateau, i. e., proof of a prima facie case. The only thing that Plaintiff proved was that he is of Mexican-American descent, that he was known to be active in affairs in the Mexican-American community, and finally that his contract was not renewed. What Plaintiff asks this Court to do based on that proof is simply assume that because Plaintiff is within a protected minority he was necessarily the victim of discrimination. The law presumes many things but it does not allow such a presumption as Plaintiff would have this Court adopt in lieu of proper evidence.

Assuming, arguendo, that Plaintiff had proved a prima facie case, Defendant more than carried its burden of enunciating legitimate, non-discriminatory reasons for non-renewal of Plaintiff's contract. The evidence is overwhelming that Defendant had ample legitimate reason for not renewing Plaintiff's contract. Plaintiff was a probationary teacher who clearly allowed his classroom performance to fall off during his second year of probation because he had other, outside interests. Defendant does not dispute the legitimacy of those outside interests, but it was not Plaintiff's place—or his right—to ignore his teaching duties in favor of extracurricular activities. Plaintiff was a teacher with a duty and obligation both to the DISD and to the students entrusted to him. The evidence is clear that those students suffered because of Plaintiff's failure to perform his teaching duties and that is more than ample reason for termination. Indeed, even Plaintiff himself, as already noted, admitted on his evaluation form that he had allowed his teaching duties to suffer in favor of the outside mariachi program. But plaintiff did more than just let his teaching duties slide during his second year of employment. Plaintiff, possibly out of misplaced zeal or possibly because he simply could not get along, began a practice of confrontation with his principal, with fellow teachers and with administrators which could not be tolerated if a proper teaching atmosphere was

to be maintained in the schools. Such confrontations were not based on Plaintiff's national origin, but on Plaintiff's desire to intrude into every aspect of school administration. Finally, Plaintiff alienated a very significant portion of his students, especially those of the black race. Evidence is clear that virtually every black student in the school transferred out of Plaintiff's band program and that Plaintiff himself was very much the cause of many such transfers because of derogatory remarks concerning black students. Again, this is not a matter of national origin discrimination, but of Plaintiff's lack of professionalism and failure to properly perform his duties as a teacher.

Since Defendant clearly enunciated numerous, justified reasons for non-renewing Plaintiff, the question becomes whether Plaintiff proves such reasons to be a pretext. The answer is "no." Other than Plaintiff's bare denials, Plaintiff produced no evidence of any kind to attack, much less rebut, the evidence of poor performance as a teacher presented by Defendant.

### Conclusion

The decision not to re-employ Plaintiff was based on his lack of acceptable performance as a teacher and was not motivated by any national origin animus. Defendant had legitimate, non-discriminatory reasons for its refusal to re-employ Plaintiff and those reasons are supported by more than ample evidence. Given the facts, this Court must conclude that Plaintiff's case is without merit and a judgment must be rendered against him.