Mary Carroll SMITH, Appellee,

v.

UNIVERSITY OF NORTH CAROLINA at Chapel Hill; John H. Schutz; Ruel W. Tyson, Jr., Appellants.

Mary Carroll SMITH, Appellant,

v.

UNIVERSITY OF NORTH CAROLINA at Chapel Hill; John H. Schutz; Ruel W. Tyson, Jr., Appellees.

Nos. 79–1221, 79–1222.

United States Court of Appeals, Fourth Circuit.

Argued Feb. 6, 1980.

Decided Sept. 30, 1980.

Elisabeth S. Petersen, James B. Craven, III, Durham, N.C. (Everett, Everett, Creech & Craven, Durham, N.C., on brief), for appellants.

Edwin M. Speas, Jr., Special Deputy Atty. Gen., Raleigh, N.C. (Rufus L. Edmisten, Atty. Gen., Elizabeth C. Bunting, Asst. Atty. Gen., Raleigh, N.C., on brief), for appellees.

Robert E. Williams, Douglas S. McDowell, Edward E. Potter, McGuiness & Williams, Washington, D.C., on brief, as amicus curiae.

Before WIDENER and MURNAGHAN, Circuit Judges, and HAWKINS *, District Judge.

---

\* The Honorable Falcon B. Hawkins, United States District Judge for the District of South Carolina, sitting by designation.

1. As used henceforth, the "University" includes the University and the individual defendants, Professors John Schutz and Ruel Tyson, Jr.

2. 29 U.S.C. §§ 621–634.

MURNAGHAN, Circuit Judge:

When the Department of Religion at the University of North Carolina declined to promote or to reappoint Assistant Professor Mary Carroll Smith, she, after unsuccessfully pursuing administrative avenues of relief, filed an action in the United States District Court for the Middle District of North Carolina against the University and several faculty members. Alleging that various University members had violated her federal and state constitutional and statutory rights when they decided not to renew her teaching contract, she sought declaratory and injunctive relief, damages, and either reappointment or promotion with tenure. While numerous issues were raised and decided by the district court, the only remaining issues of concern to us are whether the University[1] discriminated against Smith because of age, in violation of the Age Discrimination in Employment Act (the "ADEA"),[2] and whether the University discriminated against her because of sex and religion, in violation of Title VII of the Civil Rights Act (Title VII).[3]

The age discrimination issue was tried before a jury which rendered a verdict in favor of the University.[4] Earlier motions by both parties for summary judgment as to the age discrimination claim were denied by the court as was Smith's later motion to enter a judgment notwithstanding the verdict. The sex and religious discrimination charges were tried to the court. It too found for the University. The final results in the district court, on the merits of each issue raised, therefore have amounted to total victory for the University, total defeat for the plaintiff.

As an interim measure, pending a decision on the merits, this Court had reversed the district court's refusal to enter a tempo-

3. 42 U.S.C. § 2000e.

4. At the close of the appellant's case, the court granted the University's motion for a directed verdict on Smith's claims of conspiracy and a deprivation of procedural due process. The correctness of that ruling has not been questioned here.

rary restraining order and preliminary injunction. We ordered entry of an injunction to continue in effect "until a trial of the case is had and a decision entered upon the merits." Under the injunction, the University was required

(a) to continue the plaintiff's employment;

(b) to refrain from hiring a replacement for the plaintiff;

(c) to maintain in effect the plaintiff's teaching position;

(d) to pay the plaintiff as theretofore; and

(e) to refrain from disseminating information injurious to the professional or personal reputation of the plaintiff.

Although she failed in the end to prevail on the merits on any of her claims, the court, pursuant to 42 U.S.C. § 2000e–5(k), awarded Smith $8,300 in attorneys' fees and $302.06 in related litigation expenses which represented the costs incurred in obtaining the preliminary injunction.

Smith now seeks our review of the proceedings below, contending that: (1) the court's instructions to the jury were erroneous with respect to the standard applicable to age discrimination claims and to her burden of proof; (2) the court erred when it refused to grant her motions for summary judgment and judgment notwithstanding the verdict on the age discrimination claim; and (3) the court's findings regarding the sex and religious discrimination claims were clearly erroneous. Dissatisfied by the award of attorneys' fees, the University filed a cross–appeal in which it argues that Smith, although successful in obtaining a preliminary injunction, was not a "prevailing party" within the meaning of the pertinent statutory provision and, therefore, is ineligible for attorneys' fees.[5]

### Factual Background

In early 1973, Mary Carroll Smith was 38 and a recent recipient of a Ph.D. from Harvard University in Sanskrit and Indian Studies. Her predominant area of scholarly concentration, interest, and research was the computer study of Sanskrit texts.[6] Prior to receiving her doctorate, Smith had earned Masters degrees in English and Sanskrit and, for seven years, had taught, first, at a small college and, then, at a community college. In addition to her formal academic religious education, Smith, for ten years, had been a member of a Roman Catholic Sisterhood.

During early 1973, the Religion Department at the University of North Carolina was striving to develop a graduate program in religion. Because the faculty was small and the budget limited, the Department faculty preferred a graduate program of general religion studies which integrated the interests and talents of all department members, rather than a program aimed at specialization. To create an academic balance within the Department, the faculty embarked on a search for a person knowledgeable in nonwestern religions–an area in which the Department perceived itself as weak. Professor Ruel Tyson, a professor of Religion at the University and then acting

5. This case, as well as any, illustrates why appearances, prior to the introduction and testing by cross–examination of all the evidence and ultimate findings of fact on the merits may be deceiving. A most distinguished member of this Court, the late J. Braxton Craven, Jr., in granting plaintiff an injunction pending the *hearing on appeal, which injunction was subsequently* adopted by this Court to last until a decision on the merits had been reached, very much saw the case in the plaintiff's light. His order states: "There is not only a likelihood but an overwhelming probability that Dr. Smith will prevail on the merits." Yet his ruling, at an early stage of the proceedings, and necessarily tentative, inevitably rested on the facts as strongly stated in plaintiff's favor as able counsel could marshal them, without a full, and as it ultimately developed predominating, factual version as assembled and produced by the defendants. A turn of the kaleidoscope often produces a radically altered vision.

6. In particular, much of Smith's research focused on the Mahābhārata which is the text forming the foundation of Hinduism. Sanskrit is the language of the Mahābhārata. However, earlier texts are written in Vedic. Scholars, including Professor Smith, state that, to understand religious texts and their philosophies, it is imperative that one understand the language in which they are written.

chairman of the Department, testified that, while they were searching for a specialist in nonwestern religions, they were looking for specialists of a particular type who could move from "the base . . . of their expertise in one religion . . . and contribute to other courses and other discussions in the Department having to do with their understanding of basic issues and the Study of Religion. . . ."

Through academic channels, Tyson became aware that Smith had training suitable to the faculty vacancy. He, by letter, inquired of Smith whether she would be interested in interviewing for the position. She replied affirmatively. Thereafter the interviewing process commenced.

After interviewing Smith in Boston, Massachusetts, Tyson, desirous for advice, forwarded Smith's resumé and supporting materials to Professor John Schutz, the chairman of the Department, who was in Europe conducting research. In his letter, Tyson wrote that he was very favorably impressed with Smith and proceeded to enumerate her strengths. Despite his positive impression of her, Tyson did have a few reservations which he expressed as follows:

> Her age is sore cause for worry, 38 years in June. However, to be a first woman in the Dept. I place some premium on experience and maturity, a person not susceptible to fads and fashions, and on that score, I have no worry. . . . The other question concerns the status of her review two years hence for reappointment or tenure, etc. Will we be under pressure to promote after just three years, given her previous experience etc.? . . . I should also have added into this question–equation, the factor of age. She is a former nun, but seems to have worked all that out nicely, anyway, all that is some years back.

Reflecting upon these remarks at trial, Tyson said the only reason he mentioned Smith's age was because he, as acting chairman, was a novice in the reappointment process and was unsure what considerations were important. He claimed that he "took an affirmative view toward [Smith's] age,"

believing that, in her case, it was an indicator of "maturity and experience." With regard to the question about promotion at first review, Tyson again attributed it to his new role and also to Smith's specific inquiry directing his attention to the issue.

Responding to Tyson's letter, Schutz was "less than dazzled by Ms. Smith on paper." His primary concern was that she had "a technical interest in texts which happen to have religion as their subject matter," as opposed to having "an interest in religion as a subject matter." Also troubling Schutz were the periods of time in which Smith failed to explain her activities. Tyson, in a letter, attempted to address and dispel Schutz's concerns.

After much deliberation, Professor Tyson, in April 1973, extended an employment offer to Smith. Tyson explained to Smith that the University was offering her an initial 3–year probationary contract and that during the second year of the probationary period, the department chairman would make a recommendation to reappoint, to promote, or not to renew her contract. Smith accepted the offer and, by letter, stated, "the *Faculty Legislation on University Government* does not mention the promotion of an assistant professor at the first review . . . . I am accepting the position in the hopes of promotion at the first review." Responding to Smith's desire for early promotion, Tyson expressed his understanding of the promotion process as follows:

> Again, because my experience is not deep in these matters, I think I can safely say that a faculty member may be promoted at any time: such promotions are not tied to first review, second review, etc. I mean by this that the legislation you refer to demands the reviews indicated there, but does not pre–empt early [sic] action than required. Again, departments differ and I have only impressions, but I estimate that over half the assistant professors do serve two terms before being reviewed for promotion. However, so many things enter here it is not safe to generalize. The study of tenure current-

ly underway will produce hard data on this sort of question.

While I am certainly in no position to give you any assurances regarding your hopes for promotion at first review, it is a fact that this is not unprecedented.

In July 1973, Professor John Schutz returned from England and resumed his duties as department chairman. The next month Smith assumed her teaching duties. She was the first full–time woman faculty member in the history of the Department. On October 1, 1974, Professor Schutz wrote to Smith informing her that it was time to review her teaching contract. Reiterating what Tyson had stated in his offer of employment, he explained that the review process would have one of three possible outcomes: reappointment; promotion; or nonrenewal.[7] To permit a fully informed review, he suggested that she might desire to submit evidence including scholarly work and a written statement of goals and achievements. With respect to the issue of promotion, Schutz added:

> Because you have had more teaching experience than is common for someone in the first term of an Assistant Professorship, I want to return to the matter we discussed last spring. You mentioned then what you also mentioned in an earlier letter to Ruel Tyson in April, 1973: that you would hope to spend only one term at the rank of Assistant Professor before promotion. *You will recall that our discussion last spring centered on the fact that such a promotion would automatically bring with it a permanent appointment, and that therefore it would more likely reflect a judgment about long–range potential for both effective teaching and a scholarship than it would reflect reward for length of past service*

> *as a teacher in general. Or to put the matter another way, the tenure decision is a professional decision about you as a teacher and scholar in your field of special interest and competence.* (Emphasis added).

To enhance her possibilities of reappointment or, hopefully, promotion, Smith submitted several research papers in addition to a statement of her scholarly goals.

A meeting of the tenured faculty was held on November 5, 1974 to discuss the renewal of Smith's teaching contract.[8] Present at the meeting were Professors Schutz, Boyd, Dixon, Long, Tyson, Sasson, and Peck. All had been furnished copies of the materials submitted by Smith and the student evaluations of her performance.

Professor Schutz testified that the meeting commenced with a review of Smith's background. After that introduction, Professor Tyson recalled that the meeting had two distinct parts. The first issue addressed was whether promotion was appropriate. According to Schutz, the criteria guiding the promotion and tenure decision were: scholarship; teaching; service to the Department and the University; and the ability of the person to satisfy the goals and needs of the Department. Mindful of those criteria, the faculty, after much debate, decided unanimously that it was premature to consider Smith for promotion and tenure.

Having foreclosed the possibility of promotion, the faculty spent the second part of the meeting discussing whether reappointment was desirable. Schutz testified that the criteria for reappointment were identical to those for promotion and tenure, the difference being the weight assigned to each criterion.[9] In his words, "[t]he de-

---

7. Those possibilities were enumerated in the Bylaws of the Trustees and Duties of Officers, Chap. IV, § 4–2(b)(2).

8. Although the tenured faculty members were engaged in the discussions involving promotion or reappointment of nontenured faculty, the ultimate decision was the responsibility of the department chairman.

9. It was Tyson's perception that the criteria used for reappointment were: scholarship as evidenced by published works, research in progress, and departmental contributions; teaching; service to the Department, University and state; and potential for future growth in the aforementioned areas. The criteria were included in the HEW affirmative action document and, although the document was not physically before the faculty, it was considered

mands would be higher for promotion and tenure than they would be for reappointment."

The conclusion of most of the faculty members was that reappointment should not be offered. For example, while Professor Peck believed that Smith was a good Sanskrit scholar, he felt she was critically deficient in her abilities to perform the wider responsibilities of her teaching position. He questioned her capacity for growth and development.

Professor Long voiced criticism about Smith's inability to recognize the implications of her work. He also was concerned over the narrowness of her work; Smith channeled most of her energy into the technical aspects of the Mahābhārata, ignoring the nonwestern religions and the basic issues, common to all religions.

Similar concerns were raised by Professor Tyson who in addition noted that she was doing little comparatively with her knowledge of the epics nor did she seem able to recognize the implications of her narrow focus nor to transfer them to other areas of religion. Recalling his impressions at trial, Tyson testified that he noticed that Smith had difficulty teaching religion and discerning the subject matter which should be discussed. Furthermore, he found her arguments and discussions in meetings to be difficult to follow, and frequently they were not pertinent to the issues being addressed.

Having had numerous occasions to engage in scholarly discussions with Smith, Professor Dixon was distressed about her responses to his questions. In his words:

Professor Smith would be inclined to give me a question [sic] as though it were a memorized answer for a course, the clos-

est thing she could come to an answer to my question, but it didn't fit. The result was that very quickly I stopped seeking this kind of help because it wasn't–I wasn't getting any help, and this obviously began to raise questions in my mind about her ability to deal even with the areas that we had assumed were those of her training and competence when she is trying to communicate with other members of the Department.

Moreover, when she participated in faculty meetings, she dominated them with irrelevant issues that other faculty members did not desire to discuss. It was his perception that her nonresponsiveness extended to her teaching activities; her students were asking to be taught but she was not honoring their request.

Of particular concern to the faculty, in this meeting, was, if Smith were reappointed, what were her prospects for tenure when the next review occurred in three years. As Schutz testified, the feeling was that if the possibility of tenure were low, then there was a strong justification for not renewing the contract.[10] Although noting that reappointment did not commit the University to promote at the next review Schutz stated that it "certainly [tells] a person that you hope and you believe that [she] will be ready for another review in three years for tenure." It was in such a context that Professor Dixon, seeing fatal flaws in Smith's work, uttered the comment that Smith was too old to change. A discussion then occurred about the likelihood that Smith would progress in light of her development over the prior two years; it was acknowledged that she was a beginning scholar. Schutz recalled that many decisively negative remarks were made. Schutz recalled that Smith's age arose in

by the faculty when addressing the reappointment of Professors Powell, Sanford, and Smith.

10. A similar account and rationale was given by Professor Long. Age was not a factor which influenced the negative determination but rather a consideration which, if the possibility for tenure was slight, mitigated towards making a decision then instead of prolonging what was perceived as the inevitable. The fac-

ulty was concerned with being fair to Smith. Spending six years at a University without the award of tenure could be difficult to explain professionally. But, more importantly, if the possibilities of tenure were negligible, it would seem probable that a professor would desire to go elsewhere to develop his or her career rather than unproductively biding time at a University where there was no future.

two contexts: her potential for growth and development and the professional consequences to Smith if the Department took either action.

Professor Schutz testified on cross–examination that Smith's background as a member in the Roman Catholic teaching order played no role in the evaluation and review of her. Her training as a Roman Catholic was neither relevant as experience nor as an individual religious preference considered in the employment decision.

When the meeting ended, the prevailing mood was that an offer of reappointment should not be extended. Professor Sasson was the only member harboring doubts on that issue. He was concerned that they were being too harsh in their criticisms of Smith. In his November 6, 1974 letter to Professor Schutz, he expressed his dissatisfaction with the meeting:

> [I] would . . . like to register a protest at the nature, the direction, and the level of discussion which unfolded during our evaluation. I feel that our criteria became over–refined as the discussion unraveled, and in many cases edged on irrelevancies. We seem to have demanded gratification in areas which, in other candidates, were left uninvestigated. In such a sensitive matter, we owe it to ourselves that we base our decision (if negative) on firmer reasons than the ones we seem to be offering.

Professor Long also expressed concern about the review procedures. He felt that a desperate need existed to establish departmental criteria. In his letter to Professor Schutz he recommended that the criteria should be "teaching, research and writing, general faculty responsibilities, [and] compatibility within the *intellectual* orientation of the faculty." Applying his recommended criteria, Long proceeded to evaluate Smith. With respect to her research and writing Long opined:

> What I find missing in her work is the context for a discussion of these issues. Hardly any use is made of the work of Georges Dumezil, who over the last thirty years has devoted himself to an analysis

of the Mahābhārata and the religious cultural life of the Indo–Europeans. . . . I mention these texts not because they are not mentioned in her work but because she has chosen not to take account of previous scholarship in an area in which she wishes to work and thus the context for her work is not established as part of a cultural humanistic endeavor. I am therefore suspicious of her use of computer analysis in the absence of materials of the sort mentioned above for it may be an indication that she does not understand the real scope of her proposal.

Noting that her teaching was difficult to evaluate, he nevertheless criticized her for her "mystical attitude" towards teaching. Long, reviewing one of her examination questions, felt it to be "absolutely naive."

Nor did Long have favorable comments about Smith's compatibility within the intellectual context of the faculty. He observed that:

> Professor Smith does not know what we are about most of the times. It appears too often that she does not understand the meaning of the university and the type of discourse appropriate to it. In most cases she tends to stifle the discussion of her colleagues in obscurantist manners regarding topics that are purely personal and stated in a personal rhetoric. Her presence has never enhanced any faculty discussion I have attended.

In concluding that Smith should not be reappointed, Long raised these general considerations:

> In many respects Professor Smith is only at the very beginnings of her career. She seems to be competent in the Sanskrit language but she appears to be very naive regarding the context in which this competence might make sense. The most immediate context should be that of defining an almost "sacred" language in religious terms. She has great difficulty coming to terms with what is and ought to be the study of religion, and she does not yet know how to go about making other disciplines and areas of scholarship amenable to and aspects of a scholar's work in the University community. . . .

I do not think that she fulfills the kinds of intellectual needs of this Department and that it will be some time before she becomes a mature scholar. When I compare her with students who took their doctorates within a two year period of the awarding of her degree, I find that she is far behind them, and I refer to those who have also had to learn difficult languages.

I think that should we reappoint her such reappointment would be tantamount to promotion to tenure three years hence. I cannot see the germs of growth in her such that she should or could be considered for tenure after three more years.

Schutz responded to Long's letter on November 7, 1974. While acknowledging that the Department did not have specific procedures and criteria, he noted that there were "very few departments which [could] reduce these factors to precise equations. . . ." Moreover, the issues raised by the Smith case had never arisen before.

Aware of Long's dissatisfaction with the first meeting and Sasson's feelings that they were being too harsh in their criticism of Smith, Schutz thought it advisable to convene a second meeting. He believed that a second meeting would afford the faculty another opportunity to evaluate Smith after having had time to reflect following the first meeting. Perhaps more importantly, he wanted to insure that the initial criticisms in the first meeting had not merely served as a catalyst to list Smith's negative traits, without attention being properly paid to her strengths. The meeting was held on November 12th. Retracing his thinking at the second meeting, Tyson remembered that his conviction had intensified that there was a strong probability that "Smith would not develop sufficiently in the areas that most concerned [him] to present [the Department] with a strong candidate for tenure three years hence. . . ."

To facilitate his analysis, Schutz, after the second meeting, made notes. In the notes he listed Smith's strengths and weaknesses. When comparing these characteristics with those of Professor Sanford, "[i]t was clear [to him] that it was a generally shared perception that she was not very sophisticated in Religious Studies." Schutz read into the record the following remarks he made in his notes:

"[I]s reappointment possible?" Below that is "No." Below that indented is "Her age, strong precedents, we do *not* expect a positive decision down the road. 2) Is this fair? Are we treating like cases alike?" Below that I wrote, "Jack." Jack is Professor Sasson. . . . Number 3 is "Are Affirmative Action matters at stake–, –" then I wrote "Not that I can see." And 4, "Are her interests better cared for by one course of action than by another?"

When asked at trial what he intended by the reference to Smith's age, Schutz responded:

Well, that is considering the whole question of reappointment. There had been one mention of her age that I think that I've already mentioned in my testimony about Professor Dixon, and I wrote down her age, the age because it had arisen in the discussion in one other way. *There was no reference to chronological age at the meeting, the first meeting or the second meeting or any other, and I don't know really anyone in that room would have known of the age, but the discrepancy between her maturity and stage of professional development and her career had been brought out and that was in connection with the whole question of whether or not she was as far along as she ought to be for someone two years out of her Ph.D. and what we might do in three years and all the things I mentioned. So I put that down and it struck me that there really wasn't anything there to be said–that is, it wasn't a relative consideration.* (Emphasis added.)

With respect to the question whether like cases were treated alike, Schutz explained that, to ensure fairness to Smith, the question was designed to force him to retrace the steps taken in the reviews of Sanford and Smith. He concluded that the consider-

ations present in the two reviews were the same and that the reviews progressed similarly.

The affirmative action remark was simply to force him to analyze and determine whether the review complied with the University affirmative action guidelines. Pursuant to that goal, Schutz considered whether his recommendation would be different if Smith were a white male. He concluded that his decision would not differ.

By the last remark, Schutz explained that he was concerned with two considerations. First, if there only was but a slim possibility that if Smith were reappointed, she would be promoted at the next review, it would seem fairer to her both personally and professionally to make the decision at the first review rather than delaying an adverse determination for another three years. Apart from that concern, Schutz also had to decide what was in the Department's best interests. Being a small department with limited funding, it was of particular importance that each professor perform a function in the Department's growth and development plan. If a professor was not satisfying the expectations of the department, its goals would be thwarted.

Following much deliberation, Schutz, on November 15, 1974 [11] recommended to Dean James Gaskin of the College of Arts and Sciences that Smith's teaching contract not be renewed. To support his recommendation, Schutz wrote:

> It is in the area of scholarly research and orientation that questions arise about renewal of the appointment. Such questions are less directly concerned with the quantity and quality of publication than with the range of Professor Smith's scholarly interests and their appropriateness for this Department....
>
> The issue facing the Department is not whether to promote to Associate Profes-

sor, as Professor Smith has formally requested, but whether to renew or terminate the present appointment as Assistant Professor. Renewing the contract would give more time for consideration of Professor Smith's work, but there seems little disagreement in the Department's analysis of the evidence. More time might offer opportunity for Professor Smith to extend her work in ways the Department would find appropriate, for she is a new scholar in her field. But her strength and weaknesses are clear, and the latter are by no means absolute shortcomings. In part they are a function of her location in this kind of Department. She is a good Sanskrit scholar and only less impressive in matters of the history of religions. Clearly there are departments and schools where her work would be appropriate and she would prosper. Considering her age and all other factors it seems best to encourage her to seek a new position now. Finally, some of the deficiencies sensed in Professor Smith's approach to her field are particularly acute needs of the Department at this stage in its development.

Schutz informed Smith of his decision in person and by letter dated November 15, 1974. He told her that, after considering her work "as a teacher, departmental and University citizen, and as a publishing scholar, 'the faculty questioned, despite its "strong affirmation of much of [her] work," ' ... the overall appropriateness of [her] work for [the Department] and [its] needs...."

Shocked by the decision, Smith wrote a note to Schutz asking him to elaborate upon the reasons why she was not reappointed. Schutz explained the decision by writing:

> Many issues discussed with negative impact seem to me to fit under the larger question of the appropriateness of your

11. On the same day Schutz also sent a memorandum to the University's Affirmative Action officer in which he set forth the reasons for the Department's action. Again, the main reason was Smith's inability to extend her specialized competency to the basic areas of central con-

cern to a department of religion. While she was highly competent in her knowledge and technical analysis of ancient Sanskrit texts she lacked "[a] middle range mastery of Indian religions and of general history of religions."

skills, interests and approaches to the total task which must be accomplished within this Department by whoever might bear primary responsibility for a field such as Indian religions. Your technical command of the kinds of scholarly tools necessary for Sanskrit studies such as you have performed on the Mahābhārata, for example, is in no way in doubt. Your interest in religion in general is well known to all your colleagues here. What has seemed missing both on paper and in conversation is a command of middle range materials both primary and secondary which move from the particular focus of your specialized research through the whole range of scholarly issues and interest comprising the current status of Indian religious studies in general and then beyond to the area sometimes known as *Religionswissenschaft*. Your enthusiasm in these areas sometimes seems to outrun your command of the materials.

On November 21st, after consulting with Dean Gaskin of the College of Arts and Sciences, Smith requested the Department to reconsider its determination. Schutz alerted the faculty to the reconsideration request. Not entirely certain as to what constituted a reconsideration, Schutz sought advice from Dean Gaskin. Gaskin told Schutz that a reconsideration was simply a thorough and thoughtful reevaluation of the Department's decision. To enable an uninhibited discussion, Gaskin suggested to Schutz that he should absent himself from the reconsideration meeting. Schutz agreed. He scheduled the reconsideration meeting for early December.

When the reconsideration meeting commenced, Schutz instructed the faculty that it had two tasks: first, to reconsider its earlier review of Smith and, second, to review his recommendation. The only new material submitted for their consideration was a December 3rd memorandum submitted by Smith. After his introductory remarks, Schutz, pursuant to Dean Gaskin's recommendation, informed the faculty that he was going to absent himself from their discussions. In Schutz's absence, Professor Boyd chaired the meeting. Despite initial confusion over the novelty of Schutz's absence, the meeting eventually assumed structure. The tone of the meeting, however, did not deviate from that of the earlier sessions.

Following the reconsideration meeting Professor Boyd sent a letter to Schutz and, because it met with "immediate and enthusiastic approval," enclosed a copy of Professor Long's list of reasons for terminating Smith. Boyd summarized Long's position as, apart from a judgment on Smith's professional competence, "she [did] not fill [the] place within the plans of the department which was envisioned at the time of her employment." Boyd concurred with Long's assessment that a general statement of reasons for termination, in contrast to a specific enumeration of reasons, would be more immune to attack as being discriminatory.

Because some confusion persisted as to the legitimacy of the reconsideration meeting due to Chairman Schutz's voluntary absence, Schutz called a fourth meeting. The purpose of the meeting was to clarify the reasons for his absence in addition to insuring that Smith's reconsideration had been thoroughly discussed and understood. Recognizing their decision would be reviewed, Schutz stressed to the faculty members the need to focus on standards "early rather than late." Also of importance were the impact of Smith's expression that she did not want consideration of her long term welfare to influence their resolution of the problem and "the relatively unusual nature of a nonrenewal decision in the first term." These considerations were to be balanced with those initially evaluated: "1) long range promise as a scholar–teacher with several facets, skills and dimensions; and 2) [the Department's] current needs during the next five years . . . ."

The conclusion reached in the fourth meeting remained unchanged from the previous sessions. Accordingly, Schutz, in January, informed Smith that the reconsidera-

tion proceedings had not altered his earlier determination.[12]

Having exhausted the review possibilities within the Department, Smith, on October 2, 1975, submitted her case to the University Grievance Committee. The Committee interpreted Smith's grievance as alleging due process deficiencies in the University review procedures and discrimination because of sex, religion, and the exercise of First Amendment rights.

The Department, in summarizing its reasons for its decision to the Committee, stated:

> She is on the one hand unable to relate her special area of scholarship to the broader issues of the study of religion, and, on the other hand, she has no coherent language or systematic mode of dealing with basic theoretical questions in the area of religious studies. It was primarily on grounds related to this issue that she was not reappointed.

The Committee, after conducting a thorough investigation, rendered its report on February 17, 1976. Among its findings were that: Smith was the first full-time female faculty member in the Religion Department and the first member of that Department not to be reappointed or promoted during the review process; the Department did not have a formal list of criteria for reappointment and promotion; and Smith was a victim of discrimination. It was their opinion that age was a factor in the Depart-

ment's decision especially since Smith, by requesting promotion, had imposed a greater seriousness in the Department's deliberations than if only a reappointment decision was involved.

The Committee, after finding that Smith had demonstrated a prima facie case of sex discrimination, found that the Department's reliance upon Smith's deficiencies in the history of religion was a protect for sex discrimination. To justify its conclusion the Committee relied on two items of evidence: the reason for not reappointing Smith did not relate to the Department's established formal or informal criteria; and although Smith's weakness was present in some male members of the faculty, it was not examined in their reappointment or promotion decisions. In summarizing its findings, the Committee held:

> In essence, an academic department with an admitted history of discrimination against women hired its first female faculty member with a narrowly defined and clearly understood speciality for her teaching and research, which she fulfilled in the classroom and in her publications; some time thereafter the department instituted a new evaluation criterion, [competency in the history of religion], for continued employment but did not communicate it to her as it had done with other personnel criteria; the department then fired her for not meeting that new

---

12. Having decided that Smith's teaching contract would not be renewed, the Department began a search for a replacement. It circulated the following advertisement in academic circles:

"A scholar/teacher in Vedic and/or Indo Iranian religions. *Applicants must demonstrate abilities in historical methodologies and conceptual issues bearing on interpretation of religious phenomena.* Teaching experience since completion of Ph.D. preferred." (Emphasis added.)

Professor Tyson testified that:

"[W]e were looking for specialists, but we were looking for a specialist who had capacities to relate their methodologies to methodologies employed by other members in the field of Religious Studies, including other members of the Department. Secondly, we wanted people who had competence in the

interpretation of religious phenomena, and I would have to say from my point of view, that the reasons for the inclusion of all of these requirements, particularly the last two about methodologies and some sophistication in the interpretation of religious phenomena, arose directly out of our discussions of Professor Smith's deficiencies in the various meetings and her review."

After interviewing many candidates, the Department decided to offer the position to Diane Eck, a Harvard Ph.D., who was an exceptional scholar and specialist in Indian religions. However, as her background and her recommendations indicated, her primary focus was not her narrow specialty but religious studies in general. Dr. Eck accepted the position, yet, because of the litigation with Smith, the University was forced to withdraw its offer.

criterion while at the same time reappointing a male colleague in equivalent status without even evaluating him in light of the new criterion; and the department in taking that action considered elements of sex discrimination among the undifferentiated impressions that influenced its course. Thus, all the categories of evidence that need to be explored in analyzing a claim of sex discrimination, save one–intent to discriminate–yield information that requires the committee to uphold the grievance.

The Committee recommended that the Department reconsider its action and offer Smith reappointment with the understanding that tenure would not be automatic after the expiration of the three-year reappointment contract.

In spite of the Grievance Committee's recommendation, the Department, after several meetings, refused to alter its prior determination. Professor Tyson, the new chairman of the Department, informed Smith of his determination on March 24, 1976. Smith's appeal of the decision to all levels of the University was unavailing. Thereafter, on July 16, 1976, she filed a complaint in the United States District Court for the Middle District of North Carolina.

It is in the context of the detailed factual situation which has been described with particularity, that the several legal contentions advanced by the parties must be analyzed and dealt with. It should be observed, that following a full–scale trial, with findings of both jury and judge, the University, as the winning party, became entitled to a statement of facts as strongly favorable to its contentions as the proceedings would permit. We have stated the facts not as we necessarily should have found them, acting *de novo*, but as the factfinder (jury or judge) reasonably, and with sufficient support, was entitled to find them, or, when articulated, did find them.

## I. *The Jury Instructions*
### A. Introduction

In instructing the jury on the age discrimination claim, the court explained:

The Age Discrimination in Employment Act makes it unlawful to not reappoint or promote any individual who is covered by the Act if age is a causal factor in the non–reappointment or non–promotion of the individual. The Plaintiff has the burden of proof on these issues. To meet this burden, the Plaintiff must prove each of the following things by a preponderance of the evidence–*first*, that she was an employee covered by the Age Discrimination Act, and, ladies and gentlemen, you're instructed that as to this element, the undisputed facts in this case establish that the Plaintiff, Mary Carroll Smith, was an employee covered by the Age Discrimination Act, and *second*, that the Defendant University refused to reappoint or promote the Plaintiff, and *thirdly*, that the Defendant University in so refusing did so because of the Plaintiff's age. In determining whether the Plaintiff has proven these elements, you are instructed that the Age Discrimination in Employment Act prohibits employers, including Universities, from discriminating against their employees on the basis of age.... In order to establish the third element–that is, that the Defendant University in so refusing did so because of the Plaintiff's age in order to establish that element, the Plaintiff must show by preponderance of the evidence that the University refused to reappoint or promote the Plaintiff because of her age. *The Plaintiff is not required to prove that the refusal to reappoint or promote her was based solely on her age. Rarely can it be said that a person making a decision is motivated solely by a single concern or even that a particular purpose was the dominant or primary one. The Plaintiff is required to prove only that her age was a substantial or motivating factor in the decision not to reappoint or promote.* If on either the reappointment issue or the promotion issue, the Plaintiff fails to satisfy you that each of the three elements exists, then you would answer "no" with respect to that issue. How-

ever, if you decide that the Plaintiff has carried her burden in that respect to either or both the reappointment or promotion issue, you must then decide whether the University would have made the same decision not to reappoint or promote the Plaintiff even if the University had not considered the Plaintiff's age or some other illegitimate factor such as her sex or religion. In answering this question, the burden is on the University to show by a preponderance of the evidence that it would have reached the same decision not to reappoint or promote the Plaintiff if it had not considered the Plaintiff's age or some other illegitimate fact. If after considering this question you decide the University has failed to satisfy you by a preponderance of the evidence that it would have reached the same decision, you should answer the issue "yes" in favor of the Plaintiff; however, if the University has satisfied you that it would have reached the same decision, you should answer the issue "no" in favor of the University. (Emphasis added.)

At trial and on appeal, Smith finds fault with the instructions because they, in her opinion, did not set forth with sufficient clarity "the extent to which age discrimination must be involved in the employment decision for it to be actionable." In particular she finds missing from the instructions the information that the justifications offered by the University could be pretextual and that age discrimination could be indirect or unintentional. Furthermore, Smith argues that the court erroneously stressed to the jury that age must be the sole criterion for refusing reappointment or promotion and that the University could escape liability for age discrimination if it could show that it would have reached the same decision if age had not been considered. It is Smith's position that once age has been shown to have been *considered*, the University has the burden to show that age was not a factor *influencing* its decision.

■ We commence our review by recognizing that an appellate court, when assessing the adequacy of jury instructions, is guided by the rule that the instructions should be viewed as a whole. "If the judge's instructions properly present the issues and the law as applicable, it is no ground for complaint that certain portions, taken by themselves and isolated, may appear to be ambiguous, incomplete or otherwise subject to criticism." *See Laugesen v. Anaconda Co.*, 510 F.2d 307, 315 (6th Cir. 1975).

■ In an ADEA action, the plaintiff has the burden to show that his dismissal was attributable to age discrimination. *Loeb v. Textron, Inc.*, 600 F.2d 1003, 1017 (1st Cir. 1979). When an ADEA case is tried by a jury, "[t]he central issue, which the court must put directly to the jury, is whether or not plaintiff was discharged 'because of his age.'" *Id.* Many courts in setting fourth the elements of proof and allocating the burdens of proof in ADEA cases have borrowed the principles enunciated in the Title VII case of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). To establish a prima facie case of discrimination under *McDonnell Douglas*, a plaintiff must show: (i) that he is a member of the protected class; (ii) "that he . . . was qualified for [the] job [and his performance satisfied his employer's expectations] . . . ; (iii) that, despite his qualifications [and performance], he was [dismissed]; and (iv) that, after his [dismissal], the position remained open and the employer continued to seek applicants from persons of complainant's qualifications." *Id.* at 802, 93 S.Ct., at 1824; *see Loeb v. Textron, Inc.*, 600 F.2d at 1011–14; *Schwager v. Sun Oil Co. of Pennsylvania*, 591 F.2d 58, 60–61 (10th Cir. 1979); *Kentroti v. Frontier Airlines, Inc.*, 585 F.2d 967, 969–70 (10th Cir. 1978); *Price v. Maryland Casualty Co.*, 561 F.2d 609, 612 (5th Cir. 1977).

■ Under the approach of *McDonnell Douglas*, when a plaintiff is successful in proving a prima facie case, the second stage of proof requires the employer only "to articulate some legitimate, nondiscriminatory reason" for its action. *McDonnell Douglas Corp. v. Green*, 411 U.S. at 802–03, 93

S.Ct. at 1824. He is *not* required at the second stage to prove absence of discriminatory motive by a preponderance of the evidence. *Board of Trustees of Keene State College v. Sweeney*, 439 U.S. 24, 99 S.Ct. 295, 58 L.Ed.2d 216 (1978). Once the employer satisfies this production of evidence by showing a legitimate nondiscriminatory reason for its decision, the plaintiff must move to the third stage to prove that the employer's reason, which on its face appears an adequate justification for its action, is really no more than a pretext for age discrimination. *McDonnell Douglas*, 411 U.S. at 804, 93 S.Ct. at 1825. A plaintiff prevails who succeeds in convincing the trier of facts that the justification is a pretext for discrimination.

Examining the instructions which were given to the jury in the present appeal, it is apparent that the court did not recite the full *McDonnell Douglas* formulation. The court instructed the jury that first, it had to find that Smith was covered by the ADEA; second, that she was denied reappointment and promotion; and third, and most importantly, that the University's decision was because of Smith's age. With respect to the first element, the court told the jury that it was undisputed that Smith was covered by the Act. While the court did not explicitly instruct the jury that it was to find for the plaintiff as to the second element, obviously it was a point as to which there was no dispute; everyone acknowledged that Smith had not been reappointed and that she had not been promoted. The plaintiff was excused from the burden of proving the other two elements, under *McDonnell Douglas*, of a prima facie case. Having mentioned two necessary elements of proof as to which indisputably Smith had made out her case, all that remained to be proven under the charge was that the reason the University refused to reappoint or to promote was because of her age. Age need not be the sole reason but it must have been a substantial or motivating reason—a determinative reason—in the University's determination. *Loeb v. Textron, Inc.*, 600 F.2d 1003, 1019 (1st Cir. 1979). That determination, as mentioned previously, is the central concern in all age discrimination cases. The court then instructed the jury that, once Smith had proved the three elements, she would be entitled to recover unless the jury should determine that the University had demonstrated, by a preponderance of the evidence, that "it would have reached the same decision not to reappoint or promote the Plaintiff if it had not considered the Plaintiff's age or some other illegitimate fact." Unless the University satisfied its burden—again it must have done so by a preponderance of the evidence—the jury was instructed that it must render a verdict for Smith.

Again, therefore, the *McDonnell Douglas* formula was curtailed in a manner favorable to Smith. Instead of requiring a two step proof, with the University required to shoulder the burden of articulating a legitimate nondiscriminatory reason and the plaintiff then compelled to adduce evidence of pretext, the district court placed the final burden directly on the University of demonstrating by a preponderance of the evidence that age discrimination did not cause the action of which plaintiff complained. It, therefore, essentially gave the jury the benefit of a finding that pretext had been made out. Technically, *Board of Trustees of Keene State College v. Sweeney*, 439 U.S. 24, 99 S.Ct. 295 (1978), was violated, but since it was the University, as the party who prevailed under the jury verdict, who was injured, not Smith, any error is not grounds for reversal.

■■ To recapitulate, comparing the instructions with the *McDonnell Douglas* formula we note that the instructions: (1) omitted some of the elements of a prima facie case as to which the burden under *McDonnell Douglas* is assigned to the plaintiff; (2) rather than merely requiring the defendant to *articulate* a legitimate, nondiscriminatory reason, it required it to prove, by a preponderance of the evidence that it would in fact have reached the same decision if it had not considered the plaintiff's age; and (3) plaintiff was not required to prove pretext at all in order to have the University forced to assume the burden of

showing its decision was not the product of Smith's age or other illegitimate fact. For reasons that will soon become apparent, the instructions, although not completely conforming to the *McDonnell Douglas* requirements, were adequate and any errors that were committed favored, rather than harmed, the plaintiff.

### B. Degree of Required Identity with *McDonnell Douglas* Instructions

Recently, the First Circuit, in *Loeb v. Textron, Inc.*, 600 F.2d 1003 (1979) had occasion to address the applicability of the *McDonnell Douglas* principles, composed for a court trial under Title VII, to a jury trial of an ADEA claim. Noting the similarities in purpose and provision between the ADEA and Title VII and the absence of any indication in the legislative history that Congress intended "age discrimination . . . to be subject to different standards and methods of proof than race or sex discrimination," the court concluded that the *McDonnell Douglas* formulation was appropriate for ADEA cases tried by a jury.

Although appropriate for ADEA cases, the court was careful to stress that the jury need not be instructed as to all the *McDonnell Douglas* elements. It stated:

> *McDonnell Douglas* was not written as a prospective jury charge; to read its technical aspects to a jury, as was done here, will add little to the juror's understanding of the case and, even worse, may lead jurors to abandon their own judgment and to seize upon poorly understood legalisms to decide the ultimate question of discrimination. Since the advantages of trial by jury lie in utilization of the jurors' common sense, we would have serious reservations about using *McDonnell Douglas* if doing so meant engulfing a lay jury in the legal niceties discussed in this opinion.
>
> But we do not equate use of *McDonnell Douglas* with a requirement that the full formulation be read *in haec verba* to the jury. *McDonnell Douglas* is to a large

extent an analytical framework enunciated *post hoc*, in light of a given set of facts, to give judges a method of organizing evidence and assigning the burdens of production and persuasion in a discrimination case. In light of this and the fact that the defendants' burden is one of production rather than of persuasion, only the factual determinations necessary to the underlying rationale of *McDonnell Douglas* need be made by the jury—the burden—shifting can and should be monitored by the judge. Moreover, the term 'prima facie case' need never be mentioned to the jurors; . . . *McDonnell Douglas* should be used to identify the important factual issues, and these can be set out in the charge, or in special questions, divorced from legal jargon.

*Id.* at 1016.

Depending on the nature of the evidence, the jury may never need to be educated as to the elements of a prima facie case. Recognizing that "direct evidence of discrimination is likely to be unavailable,[13] and . . . the employer has the best access to the reasons that prompted him to fire, reject, discipline or refuse to promote the [employee]," the prima facie case requirement was designed to assist the employee in surmounting these evidentiary obstacles. *Loeb v. Textron, Inc.*, 600 F.2d at 1014. Once an employee makes out a prima facie case "an inference of discrimination [arises] only because we presume these acts, if otherwise unexplained, are more likely than not based on the consideration of impermissible factors. . . . And we are willing to presume this largely because we know from our experience that more often than not people do not act in a totally arbitrary manner, without any underlying reasons . . . ." *Furnco Construction Corp. v. Waters*, 438 U.S. 567, 577, 98 S.Ct. 2943, 2949, 57 L.Ed.2d 957 (1978). Thus, "[i]f the principle [sic] ingredients of plaintiff's case are inferences that are to be derived from the underpinnings of the *McDonnell Douglas*—type prima facie case, the jury should be asked to make

---

**13.** In our case, of course, references to age, claimed by Smith to evidence discrimination, appeared in the faculty interchanges on the issues of her reappointment or promotion.

these findings." *Loeb v. Textron, Inc.*, 600 F.2d at 1018.

However, as suggested by the court in *Loeb*, when a plaintiff introduces direct and/or circumstantial evidence of discrimination, instructing the jury about the elements of a prima facie case, in addition to being superfluous, may be confusing. That court stated:

> [It is likely that most cases will not] fit a 'classic' or 'pure' *McDonnell Douglas* paradigm.... At least two other types of cases seem likely. *One is a case which simply does not fit the mold of the McDonnell Douglas formula, as where plaintiff's evidence of discrimination is significantly different (for example, where plaintiff relies chiefly upon direct evidence of discriminatory motive in a letter or on an admission from defendant). The court should not force a case into a McDonnell Douglas format if to do so will merely divert the jury from the real issues*; rather it should use its best judgment as to the proper organization of the evidence and the charge. *In cases of this type, the best charge may simply be one that emphasizes that plaintiff must prove, by a preponderance of the evidence, that he was discharged because of his age–with adequate explanation of the meaning of the age statute, the determinative role age must have played, etc.,*
> . . . .

> Another case would be one in which proof of the *McDonnell Douglas* elements is a significant part of plaintiff's total evidence, but where there is also other evidence, direct or circumstantial, that might support an inference of discrimination.... Here the district court will

again have to exercise its judgment. Strict adherence to *McDonnell Douglas*, with instructions as to all elements of the particular prima facie case there described, may not be required. If, for example, there is substantial other evidence to warrant a finding of discrimination, it may be superfluous to tell the jury that it must find each element of the prima facie case. Rather, as in the previous case, *the question of discrimination can be put more directly and simply.* (Emphasis added.)

*Id.* at 1018.

■ Thus *Loeb* teaches first, that, while *McDonnell Douglas* may be appropriate to a jury trial of an ADEA case, all the elements need not be recited to the jury, and second, that, despite its appropriateness to age discrimination claims, *McDonnell Douglas* is not the only permissible standard;[14] other formulations may be proper, especially when direct and circumstantial evidence of discrimination have, as here, been introduced. We believe that Professor Smith's case is covered by the second aspect of the *Loeb* lesson.

Most of the evidence that Smith introduced consisted of notes taken by and correspondence among Religion Department professors. In such a situation, the jury was not concerned so much with the inferences possible from the *McDonnell Douglas* type prima facie case as it was with whether the direct evidence that Smith introduced, demonstrated that the University's decision was unlawfully motivated by her age.

As we construe the court's language, the three elements that it required Smith to

---

**14.** The court's failure to employ the *McDonnell Douglas* language was not fatal. As the court acknowledged in *McDonnell Douglas*, 411 U.S. at 802, n.13, 93 S.Ct. at 1824, n.13, and as discussed in *Loeb v. Textron, Inc.*, 600 F.2d 1003 (1st Cir. 1979), the entire *McDonnell Douglas* formulation is not a rigid requirement but only a suggested procedure. "[I]t is merely a sensible, orderly way to evaluate the evidence in light of common experience as it bears on the critical question of discrimination." *Furnco Construction Corp. v. Waters*, 438 U.S. 567, 577, 98 S.Ct. 2943, 2949, 57 L.Ed.2d 957 (1978).

Furthermore, the First Circuit cautioned in *Loeb*, that the formulation "should not be used inflexibly as a vehicle for organizing evidence or presenting a case to a jury. *Above all, it should not be viewed as providing a format into which all cases of discrimination must somehow fit....* McDonnell Douglas points to one, but surely not the only, way of establishing a legally sufficient prima facie case and of organizing and analyzing the evidence in a private discrimination case." (Emphasis added.) 600 F.2d at 1017. Other formulations may function as well.

prove by a preponderance of the evidence constituted a variety of a prima facie case of discrimination although not expressed in classic *McDonnell Douglas* terms. Once Smith had satisfied the proof, the court placed the burden of rebuttal on the University. The right of rebuttal consisted of the right to produce for the jury evidence that, even though prima facie case had been made, still, in point of fact, the refusal to reappoint or to promote actually proceeded from other reasons unrelated to age–that plaintiff would not have been reappointed or promoted whatever had been her age. Smith contends that she was prejudiced by this portion of the court's instruction. She argues that once she demonstrated that age was a determinative factor in the University's decision, the burden was on the University to show that it was not a substantial factor in its decision. Smith would have us engage in a meaningless semantic exercise, for that instruction was in substance given: "In answering this question, the burden is on the University to show by a preponderance of the evidence that it would have reached the same decision not to reappoint or promote the Plaintiff if it had not considered the Plaintiff's age or some other illegitimate fact."

Even though at an earlier stage the court has determined that a prima facie case has been made out to the effect that age was an impermissible factor in the determinations not to promote, that does not end the matter. It does not shut off the defendant's right of rebuttal. That right encompasses an opportunity to prove by a preponderance of the evidence that in fact age was not a causative factor. As stated in *Laugesen v. Anaconda Co.*, 510 F.2d 307 at 317:

> However expressed, we believe it was essential for the jury to understand from the instructions that there could be more than one factor in the decision to discharge him and that he was nevertheless entitled to recover if one such factor was his age *and if in fact it made a difference* in determining whether he was to be retained or discharged. (Emphasis added.)

While the intermediate answer is that the evidence suffices to permit a conclusion that age was impermissibly relied on, it does not foreclose a final determination, based on evidence advanced by the defendant, that actually age had not played a part in the determination not to reappoint or promote–that the very same result would have come about if age discrimination, prima facie or otherwise, had never existed. *Cf. Mt. Healthy City Board of Education v. Doyle*, 429 U.S. 274, 286–87, 97 S.Ct. 568, 576, 50 L.Ed.2d 471 (1977):

> Initially, in this case, the burden was properly placed on respondent to show that his conduct was constitutionally protected, and that this conduct was a 'substantial factor'–or to put it in other words, that it was a 'motivating factor' in the Board's decision not to rehire him. Respondent having carried that burden, however, the District Court should have gone on to determine whether the Board had shown by a preponderance of the evidence that it would have reached the same decision as to respondent's reemployment even in the absence of the protected conduct.

While *Mt. Healthy* arises under the First and Fourteenth Amendments, both in it and in our ADEA case, the question of causality is involved in essentially the same fashion. As the statute makes clear, it prohibits discrimination "*because* of such individual's age" (Emphasis added). Appellant freely acknowledges at p. 2 of her Reply Brief: "We admit causation is the standard, and that, in fact, is the thrust of our argument." *Mt. Healthy* was also articulating standards with respect to a "rule of causation." *Mt. Healthy*, 429 U.S. at 285, 97 S.Ct. at 575.

As for not mentioning pretext, the district court treated that issue as decided in Smith's favor, moving directly to require the University to prove that the failure to reappoint or promote was not causally linked to considerations of age. There was, consequently, no occasion for an instruction as to pretext.

■ Having imposed upon the University the burden of showing that, even with-

out any age considerations being present at all, the plaintiff would not have been reappointed or promoted, there was no need also to instruct about pretext. For, as the Supreme Court noted in *Board of Trustees of Keene State College v. Sweeney*, 439 U.S. 24, 99 S.Ct. 295 (1978), placing the burden of proof upon the employer at the second stage also incorrectly places the burden upon him to show that the reason was not a pretext. *See generally* Runyan, *Employment Decision–Making in Educational Institutions*, 26 Wayne L.Rev. 955, 1011–13 (1980). The court in *Loeb v. Textron, Inc.* held that:

> We think it now clear that *McDonnell Douglas* leaves the burden of persuasion at all times with the plaintiff, and that the employers' burden to 'articulate' a legitimate, nondiscriminatory reason is not a burden to persuade the trier that he was in fact motivated by that reason and not by a discriminatory one. Rather it is a burden of production–i. e. a burden to *articulate* or state a valid reason, following which the complainant must show that the reason so articulated or stated is a mere pretext or 'cover–up' for what was in truth a discriminatory purpose. This, indeed, is only logical. If an employer were to *prove* that he was motivated by a legitimate reason, there would be no room left for showing that the reason was a 'pretext,' as pretext is 'a purpose or motive alleged or an appearance assumed in order to cloak the real intention or state of affairs.' Webster's Third New International Dictionary (1971). To say, as the court did here, that the defendant must prove that its action was based on a legitimate reason and that the plaintiff must 'then' prove that it was not, is contradictory.

600 F.2d at 1012.

The instruction was altogether fair to the plaintiff; the jury in finding for the University obviously concluded that the University had met its burden.

### C. Other Alleged Errors in the Jury Instructions

▮▮▮ Addressing Smith's remaining challenges to the instructions we find them all devoid of merit. That the instruction failed to mention that age discrimination may be direct or unintentional does not render it reversible error. In *Laugesen v. Anaconda Co.*, 510 F.2d 307, 314 (6th Cir. 1975), the court also omitted an instruction that the employer did not have to have the specific intent to discriminate, but rather, as the court did here, when referring to the reason for the University's actions employed the term "because of the plaintiff's age." *Id.* We think that, although language precisely relating the nature of the requisite intent was not present, the instruction managed to convey to the jury, in understandable terms, the applicable law which was that the discrimination could be either intentional or unintentional; the important consideration was whether the decision was influenced by the employee's age. " . . . the judge's instructions substantially charged the jury in the manner desired by plaintiff without using the specific language requested." *Id.*

▮▮▮ Myopically focusing upon another aspect of the instruction, Smith contends that the court, by using the phrase "because of age" stressed to the jury that, in order to find for her, they must find that age was the sole criterion for the University's decision. It is clear, of course, that the law requires only that age be *a* causative or determinative factor in the decision, not the sole reason. Nevertheless, Smith misreads the jury instructions when she claims that they required a finding that age was the sole consideration. They clearly stated that: "The Plaintiff is not required to prove that the refusal to reappoint or promote her was based solely on her age. . . . The Plaintiff is required to prove only that her age was a substantial or motivating factor in the decision not to reappoint or promote." *See Loeb v. Textron, Inc.*, 600 F.2d at 1019. We are satisfied that the jury was correctly instructed on the point.

### II. Should the Motions for Summary Judgment and Judgment Notwithstanding the Verdict Have Been Granted?

The district court denied orally Smith's motion and the University's cross–motion

for partial summary judgment on the issue of age discrimination. Smith argues that the court's ruling constituted error. Pointing to the references to her age, she argues that they constitute clear proof that her age was a determinative variable in the University's decision not to extend to her an offer of reappointment or promotion. The University denied this, and explained that the decision was attributable to Smith's performance, which because of her narrow academic focus did not satisfy the needs of the Department of Religion.

The standards governing the review of a denial of summary judgment are identical to those guiding the original decision whether the motion should be granted. The Supreme Court stated in *Poller v. Columbia Broadcasting System, Inc.*, 368 U.S. 464, 467, 82 S.Ct. 486, 488, 7 L.Ed.2d 458 (1962):

> Summary judgment should be entered only when the pleadings, depositions, affidavits, and admissions filed in the case 'show that [except as to the amount of damages] there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law....' [Rule 56(c)] authorizes summary judgment 'only where the moving party is entitled to judgment as a matter of law, where it is quite clear what the truth is, ... [and where] no genuine issue remains for trial ... [for] the purpose of the rule is not to cut litigants off from their right of trial by jury if they really have issues to try.'

*Accord Weahkee v. Perry*, 587 F.2d 1256, 1265 (D.C.Cir.1978). Thus, when a court denies a party's motion for summary judgment, it does so because "the moving party has failed to establish that there is no genuine issue as to any material fact and that he is entitled to a judgment as a matter of law...." Wright & Miller, Federal Prac-

tice and Procedure: Civil § 2715 at 424 (1973). In assessing the correctness of the court's denial, we must examine the record in a light most favorable to the party opposing the motion. *See United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962); *Poller v. Columbia Broadcasting System, Inc.*, 368 U.S. 464, 473, 82 S.Ct. 486, 491, 7 L.Ed.2d 458 (1962); *Habib v. Raytheon Co.*, 616 F.2d 1204, 1208 (D.C.Cir.1980); *Federal Deposit Insurance Corp. v. First National Finance Co.*, 587 F.2d 1009, 1010–11 (9th Cir. 1978); *Radobenko v. Automated Equipment Corp.*, 520 F.2d 540, 543 (9th Cir. 1975); Wright & Miller, Federal Practice and Procedure: Civil § 2716 at 430–32 (1973).

Applying those principles to the present appeal, we are unable to conclude that the court erred in its ruling. A genuine issue as to a material fact did exist. The reasons underlying the University's decision not to reappoint or to promote Smith were in dispute. While Smith directed the court's attention to references to her age, the references were not unambiguously indicative of age discrimination. The University offered alternative explanations for the references which the jury might find to be reasonable and which, the jury might conclude, negated the age discrimination claim. Moreover, in cases such as this one, in which an issue of unsatisfactory performance is involved, the credibility and testimony of witnesses are indeed determinative of the discrimination claim. *See Weahkee v. Perry*, 587 F.2d 1256, 1266 (D.C.Cir.1978). Summary judgment therefore was inappropriate.

Viewed as a whole a case went to the jury which could have been decided either way.[15] There was therefore no basis, on the merits, for Smith's motion for judgment notwithstanding the verdict. But even if there had been, it was waived and

---

15. It is not our function to determine that Smith was right or that the University was right. Our task is merely to ascertain whether there was sufficient evidence to support the finding made by the jury. It only requires a reading of the materials to be struck, however, with the propriety of a jury determination that the University colleagues of Dr. Smith were

honest, indeed meticulous, in their efforts to judge her by proper standards, and that, while they recognized her age, it was not a factor in the decisions not to reappoint and not to promote. While university professors are no more immune today to harsh criticism and to acid speculation as to the validity of their motives than are those from other walks of life, it is an

may not be pursued on appeal by the appellant—who failed to move for a directed verdict after the close of all the evidence.[16] *See Martinez Moll v. Levitt & Sons of Puerto Rico, Inc.*, 583 F.2d 565, 568–70 (1st Cir. 1978). 5A Moore's Federal Practice ¶ 50.08 at 50–85 to –91 (1980). The exceptions for cases where (a) there has been substantial compliance with the rule, as in *Bayamon Thom McAn, Inc. v. Miranda*, 409 F.2d 968, 971–72 (1st Cir. 1969), (b) where manifest injustice will otherwise occur since the verdict is wholly without legal support, *Sojak v. Hudson Waterways Corp.*, 590 F.2d 53, 54–55 (2d Cir. 1978), (c) where the trial judge in effect excused the failure to renew the motion, *Bayamon Thom McAn, Inc. v. Miranda*, 409 F.2d at 971–72, and (d) where the additional evidence was brief and inconsequential, *Beaumont v. Morgan*, 427 F.2d 667, 670 (1st Cir. 1970), are not applicable here. *See* 5A Moore's Federal Practice ¶ 50.08 at 50–88 to –91 (1980).

III. *Were the District Court's Findings as to Smith's Title VII Claims of Discrimination on Grounds of Sex or Religion Clearly Erroneous?*

Title VII of the Civil Rights Act protects employees from various kinds of discrimination, particularly for our present purposes discrimination on grounds of sex or of religion.[17] To prevail on a Title VII claim the employee must prove that he or she was a victim of unlawful discrimination. As we have previously discussed, in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), the Supreme Court set forth the general order and allocation of proof in a discrimination action brought by a private individual. To reiterate:

> The complainant in a Title VII trial must carry the initial burden under the statute of establishing a prima facie case of ... discrimination. This may be done by showing (i) that he belongs to a [protected class]; (ii) that he applied and was qualified for a job for which the employer was seeking applicants; (iii) that, despite his qualifications, he was rejected; and (iv) that, after his rejection, the position remained open and the employer continued to seek applicants from persons of complainant's qualifications.

*Id.* at 802, 93 S.Ct. at 1824. Due to factual differences among individual cases, the Supreme Court has acknowledged that all of the listed specifications set out in *McDon-*

---

acceptable jury conclusion on the evidence produced that the professors were, in fact, honest, sensitive and fair. It was permissible for the jury to conclude that professional considerations such as the unsatisfactory match between Smith's capabilities and the needs of the Department were the motivating factors of the decisions, with age playing no operative role.

In a different context, we have recently had occasion to remark on the absence of a "guarantee that even 'rightful' terminations would be so adjudged in the always chancey litigation process." *Garris v. Hanover Ins. Co.*, 630 F.2d 1001, 1006 (4th Cir. 1980). Smith, in facing a jury on issues which were debatable, in view of conflicting evidence and inferences, inevitably was exposed to the chancey litigation process. She might have won, but she lost, and it does not serve a valid purpose for her to pretend that the evidence admitted only one interpretation, *i. e.*, the one she favors. The contrary conclusion was fully sustainable.

**16.** At page 5 of Appellant's Reply Brief, there is the following statement:

The defendants are correct in their statement that the District Court's denial of the plaintiff's motion for judgment notwithstanding the verdict pursuant to Rule 50(b) was not properly preserved for appellate review. Fed.R.Civ.P. 50(b) provides in pertinent part:

> *Motion for Judgment Notwithstanding the Verdict.* Whenever a motion for a directed verdict *made at the close of all the evidence* is denied or for any reason is not granted, the court is deemed to have submitted the action to the jury subject to a later determination of the legal questions raised by the motion. Not later than 10 days after entry of judgment, *a party who has moved for a directed verdict* may move to have the verdict and any judgment entered thereon set aside and to have judgment entered in accordance with his motion for a directed verdict; or if a verdict was not returned such party, within 10 days after the jury has been discharged, may move for judgment in accordance with his motion for a directed verdict.... (Emphasis added.)

**17.** Age discrimination, as previously noted, is dealt with separately in 29 U.S.C. §§ 621–634.

*nell Douglas* might not be applicable to every case. *Id.* at 802 n.13, 93 S.Ct. at 1824 n.13:

> The facts necessarily will vary in Title VII cases, and the specification above of the prima facie proof required from respondent is not necessarily applicable in every respect to differing factual situations.

Once the prima facie case has been established, the burden shifts to the employer "to articulate some legitimate, nondiscriminatory reason [for its action]." *Id.* at 802, 93 S.Ct. at 1824. Articulation of a legitimate, nondiscriminatory reason suffices at that stage—there is no requirement that the employer prove by a preponderance of the evidence that the legitimate nondiscriminatory reason was in fact the motivating force. *See, e. g., Furnco Construction Corp. v. Waters,* 438 U.S. 567, 577–78, 98 S.Ct. 2943, 2949–2950, 57 L.Ed.2d 957 (1978); *Board of Trustees of Keene State College v. Sweeney,* 439 U.S. 24, 25, 99 S.Ct. 295, 58 L.Ed.2d 216 (1978):

> While words such as 'articulate,' 'show,' and 'prove,' may have more or less similar meanings depending upon the context in which they are used, we think that there is a significant distinction between merely 'articulat[ing]' some legitimate, nondiscriminatory reason' and 'prov[ing]' absence of discriminatory motive. By reaffirming and emphasizing the *McDonnell Douglas* analysis in *Furnco Construction Co. v. Waters, supra,* we made it clear that the former will suffice to meet the employee's prima facie case of discrimination. Because the Court of Appeals appears to have imposed a heavier burden on the employer than *Furnco* warrants, its judgment is vacated and the case is remanded for reconsideration in the light of *Furnco, supra,* 438 U.S. at 578, 98 S.Ct. at 2950.

If the employer makes the requisite showing, the employee must then move to the next stage and prove that the employer's articulated justification is a pretext for illegal discrimination, and the employer is permitted to adduce evidence to rebut the assertion of pretext, including proof that the legitimate nondiscriminatory reason was in fact the motivating force. *McDonnell Douglas Corp. v. Green,* 411 U.S. at 804–05, 93 S.Ct. at 1825–1826. While under *McDonnell Douglas* there obviously is a shifting of the burden of production between plaintiff and defendant, the ultimate burden of persuasion never leaves the plaintiff's shoulders. *Sweeney v. Board of Trustees of Keene State College,* 604 F.2d 106, 108 (1st Cir. 1979), *cert. denied,* 444 U.S. 1045, 100 S.Ct. 733, 62 L.Ed.2d 731 (1980).

Adapting the *McDonnell Douglas* criteria to the educational scene and to the University's decision not to reappoint or promote assistant professor Smith,[18] the district court, in identifying the standards which the trial judge, as the factfinder, was to apply, set forth the following requirements for a prima facie case:

(1) That the plaintiff belonged to a disadvantaged class or to a racial or religious minority;

(2) That the plaintiff sought and was qualified for reappointment or promotion;

(3) That the plaintiff was not reappointed or promoted; and

(4) That, in the case of reappointment, the college sought applicants to fill the position from persons of plaintiff's qualifications; or, in the case of promotion, the employer had promoted other persons possessing similar qualifications at approximately the same time.

---

**18.** Many courts have adapted the *McDonnell Douglas* criteria to the university setting. *See Whiting v. Jackson State Univ.,* 616 F.2d 116, 120–21 (5th Cir. 1980); *Jepsen v. Florida Bd. of Regents,* 610 F.2d 1379, 1382–83 (5th Cir. 1980); *Sweeney v. Bd. of Trustees of Keene State College,* 604 F.2d 106, 108 (1st Cir. 1979), *cert. denied,* 444 U.S. 1045, 100 S.Ct. 733, 62 L.Ed.2d 731 (1980); *Powell v. Syracuse Univ.,* 580 F.2d 1150, 1154–55 (2d Cir. 1978), *cert. denied,* 439 U.S. 984, 99 S.Ct. 576, 58 L.Ed.2d 656 (1978); *Peters v. Middlebury College,* 409 F.Supp. 857, 866–67 (D.Vt.1976).

Elaborating upon the elements the court first observed that women constituted a disadvantaged class. It thus made a finding on the initial issue in the plaintiff's favor. With respect to the second element, when a nonreappointment decision is involved, the plaintiff must show that her performance "was of sufficient quality to merit continued employment." A showing that an employer did not express dissatisfaction with an employee's work was deemed by the trial judge to amount to sufficient proof of qualifications for reappointment. With respect to whether regarding her separate claim to promotion the plaintiff had met the second criterion, i. e. was qualified for promotion, the employee would be required to demonstrate possession of the superior qualifications which would merit the promotion. Although the element of subjectivity makes proof of the basic qualifications of the "superior position" more difficult, it, nevertheless, may be accomplished, for example, by comparing the qualifications of those individuals who were promoted recently.

Turning to the third element, it was too obvious to need elaboration. Everyone knew and proceeded on the basic understanding that Smith was not reappointed, much less promoted.

Directing its attention to the fourth element, the court, acknowledging the difficulty in adapting it to the faculty context, stated the modified guidelines as:

> The essence of the fourth element in *McDonnell Douglas* is the requirement that the Title VII plaintiff have similar qualifications to those persons who the employer is seeking to recruit for the desired position. In cases of *nonreappointment*, this essence can be captured by requiring the plaintiff to show that the employer sought to fill the plaintiff's position with persons who had qualifications similar to those of the plaintiff. In cases of faculty *promotion*, however, this type of comparison is not usually possible because a college most often promotes a faculty member in order to recognize the teacher's accomplishments and promise and not because the college has an opening it is seeking to fill. The essential characteristic of the fourth *McDonnell Douglas* element can be satisfied in cases of faculty promotion by requiring the plaintiff to show that the college had promoted other faculty members with qualifications similar to those of the Title VII plaintiff to the desired faculty rank at approximately the same time.

■ Cognizant of the standard thus spelled out by the district judge, and recognizing his general analysis as appropriate, we now turn to address separately the precise determinations that Smith's nonreappointment and nonpromotion did not offend applicable law. Our review of the district court's findings is limited by the clearly erroneous standard of review. *See Sweeney v. Board of Trustees of Keene State College,* 604 F.2d 106, 109 (1st Cir. 1979), *cert. denied,* 444 U.S. 1045, 100 S.Ct. 733, 62 L.Ed.2d 731 (1980); *Stewart v. General Motors Corp.,* 542 F.2d 445, 449 (7th Cir. 1976), *cert. denied,* 433 U.S. 919, 97 S.Ct. 2995, 53 L.Ed.2d 1105 (1977).

### A. *The Nonreappointment Decision*

With respect to the reappointment issue, the court concluded that Smith had established a prima facie case of discrimination as to her nonreappointment claim. Smith's membership in a disadvantaged class and her nonreappointment were undisputed. The evidence established that Smith was qualified for the position: she had engaged in several types of scholarly work; had presented papers and lectures; had taught courses at Duke University; had received grants to conduct scholarly research; and had been nominated for a teaching award. There was no indication in the record that the University disputed Smith's competency as a teacher in her specialized field of study. Moreover, Chairman Schutz had never expressed dissatisfaction to Smith about her performance, having in June 1974 given her a $1000 merit raise. By offering Smith's position to Diane Eck, a fellow Harvard graduate, the court found that the University had sought to fill Smith's position with

a person possessing qualifications similar to Smith's thus satisfying the last element of the *McDonnell Douglas* prima facie case.

Finding that Smith had established a prima facie case, the court then focused its attention on its next task: had the University articulated a legitimate, nondiscriminatory reason for its action. The court observed that the University had advanced two reasons in its defense. It found the justifications in a letter from Schutz to Smith in which he attempted to explain to her the reasons for the Department's decision. Schutz wrote:

> What has seemed missing both on paper and in conversation is a command of middle range materials both primary and secondary which move from the particular focus of your specialized research through the whole range of scholarly issues and interests comprising the current status of Indian religious studies in general and then beyond to the area sometimes known as *Religionswissenschaft* [History of religion]. Your enthusiasm in these areas sometimes seems to outrun your command of the materials.

The court interpreted the letter to indicate first that Smith's knowledge of her scholarly discipline was deficient, and second, and most importantly, that Smith was unable to "relate her specialized field of study to issues of more general importance to a department of religion. . . ."

Because both of the reasons were, on their face, legitimate, nondiscriminatory reasons for not reappointing Smith, the court had next to determine whether they were merely a pretext for discrimination on the grounds of sex or religion. Although opining that the faculty members, whose scholarly expertise was in areas other than nonwestern religions, had no basis or knowledge upon which to premise their evaluation of Smith's academic deficiencies, the court characterized Chairman Schutz's assessment of Smith's competence as, at most, an honest mistake and determined that it was not a pretext for discrimination.

To assess the validity of the University's second justification, the court examined the backgrounds and performances of Dr. Jouett Powell and Dr. James Sanford, two professors who were reappointed during the same period that Smith's reappointment was denied. Dr. Powell, having served one term as an instructor and almost one term as an assistant professor, had more teaching experience at the University than Smith. The predominant reason for his reappointment was his excellent teaching ability and his willing participation in department projects. Acknowledging that Powell, in comparison to Smith, had undertaken little scholarly work, the court deduced from this that the University attributed less importance to publication than to other areas.

Perhaps more persuasive than the comparison to Powell, was the comparison of Sanford to Smith. Sanford, a Roman Catholic, was reappointed immediately prior to the commencement of Smith's evaluation. In addition Sanford, like Smith, specialized in nonwestern religions. Remarking as to the evidence of Sanford's excellent teaching ability and his valued service to the department, the most important finding by the court was that Sanford was able to "'bridge the possible gap between the very demanding technicalities of [his] specialized work and the much more general responsibilities' the members of the department share[d]." That last characteristic was precisely the one in which the University contended that Smith was deficient. According this correlation much weight, the court concluded that the second justification also was not pretextual.

Smith contends that the court's findings were clearly erroneous. In her brief she cites numerous alleged errors committed by the court. We find it unnecessary to comment upon all of Smith's multiple objections to the court's findings. It is sufficient to state as to some of them that we have reviewed them and are not persuaded that error was committed. Those asserted errors which deserve more than summary disposal are:

1. Because she taught introductory courses in religion, Smith argues that the court overlooked her ability as a "general-

ist." However, merely teaching a course, the subject matter of which is assumed to include a generalized approach to religion, is not synonymous with a master of that approach. Nothing in the record exists to indicate that the faculty members did not consider Smith's teaching assignments or that the court ignored their relevance. The faculty members who observed and evaluated her performance commented upon her inability to extend her specialized knowledge into areas of concern common to all areas of religion.

■ 2. Smith also compares her academic performance and achievements with other faculty members who were reappointed or promoted. Conducting a point by point analysis, she is able to develop arguments of superiority as to particularized attributes. What she ignores by this approach, besides the inevitable element of subjectivity involved, is the Department's predominant reason for its decision: Smith was a specialist unable to transfer her knowledge to the generalized study of religion. There was no evidence to indicate that the professors to whom she sought to compare herself were deficient in that ability. Thus, Smith was unable to prove that the University's justification was mere pretext.[19]

■ 3. Smith also criticizes the Department's lack of written criteria and procedures to guide their decisionmaking.[20] She argues that such a deficiency encouraged sex and religious discrimination. However, from the testimony of various faculty members, it seems manifest that they were aware of the factors which were most important in their deliberations. Moreover, it is clear that they were aware that Smith had requested that she be considered both for reappointment and promotion. Despite Smith's contentions to the contrary, we find the district judge's conclusion permissible that the decisions were considered and made separately, and that the adverse decision as to promotion did not infect the reappointment determination. While more formalized procedures may have been desirable, Smith's case received extensive consideration, having warranted four faculty meetings.[21] During the faculty discussions, the members thoroughly considered its decision regarding Smith. From the remarks of the faculty participants the finding was justified that Smith's performance had not fulfilled the department's needs and expectations. Since it was a small department, with limited resources, the conclusion was sustainable that it could ill afford reappointing, much less granting tenure, to a professor who lacked the skills

---

19. *Whiting v. Jackson State Univ.*, 616 F.2d 116, 124–26 (5th Cir. 1980) should be contrasted with Professor Smith's case. There, the professor was able to prove that the university's reasons for terminating his employment contract were a pretext for a discriminatory discharge.

20. John Charles Morrow, III, the Provost of the University, testified that there are four general criteria for reappointment: teaching; research or scholarship; service to the department and the University; and the needs of the department. The criteria are usually communicated by departmental colleagues to the reappointment candidate. Only in exceptional circumstances is a professor promoted after one term. Morrow estimated that early promotion occurs in one case out of ten. When asked what circumstances would support a nonreappointment decision, Morrow explained:

> They would be conditions in which the Department did not feel that the person would progress toward a status which would lead to

tenure, where the performance had not been considered entirely satisfactory and where the needs of the Department did not seem to be met. At that point then there would be no motivation to enter into another contract. Morrow estimated that annually 10–12 teaching contracts were not renewed.

21. Smith complains that the Department should have sent her work to outside scholars for evaluation since the faculty members were not experts in her area of Sanskrit and Vedic studies. We are not persuaded by the argument. Professor Long was a specialist in nonwestern religions and while his academic focus may have been different, he still had a basis upon which to make a judgment. That, however, is subsidiary to what Smith ignores: the decision not to renew her contract was not simply because of her performance in her specialization but primarily because of her inability also to be a generalist.

and knowledge appropriate to its educational plans.[22]

■ Thus, we think that there was adequate evidence to support the district court's determination that a fair interpretation of the record was that the department's justifications for its decision were not a pretext for unlawful discrimination.[23] Nothing exists in the record to obliterate the Department's defense that Smith did not fulfill the need for a specialist in non-western religions who could transfer her knowledge to the general issues common to all religion. Nor is there any indication that the other faculty members were judged according to different standards.

### B. *The Decision Not to Promote*

Unlike the reappointment decision, the district court concluded, with respect to the promotion decision, that Smith had not even made out a prima facie case of discrimination. Again, the critical elements that Smith had to show were that she was qualified for promotion and that the University had promoted others with the same qualifications during approximately the same time. The court concluded that Smith had not even shown that she was qualified for promotion.[24] Tenure after one term was most unusual. Professor Peck was the only faculty member who received tenure after one term. However, unlike Smith, he had spent more than 10 years in teaching and scholarly work since receiving his doctorate degree. Thus, since their qualifications differed, a comparison of Peck and Smith was not persuasive. With regard to the promotion decision, Ruel Tyson was the only faculty member promoted during the period when the department declined to promote Smith. Again, his qualifications were more impressive. While he had not completed the requirements for his Ph.D. he had taught at the college level for over 10 years; he had completed two terms as an assistant professor at the University; had served as acting department chairman; and had published considerably more than Smith. Moreover, he had received tenure in 1972, thus, at the time of promotion, he was not a probationary appointment.

■ Comparing the qualifications of Peck and Tyson with those of Smith, we are unable to hold that the court erred in concluding that Smith was not qualified for promotion and tenure. On the other hand, we also are aware that decisions of that nature are difficult decisions for the faculty

---

**22.** The case of *Peters v. Middlebury College*, 409 F.Supp. 857, 860, 867–69 (D.Vt. 1976) is somewhat analogous to Dr. Smith's case. In *Peters*, the English Department declined to renew the plaintiff's contract because she failed to meet its "high standards of professional competence" and because she could not teach " 'the upper division Renaissance courses for which she was recruited'." The court held that these were legitimate, nondiscriminatory reasons for the University's decision and that the plaintiff had not succeeded in demonstrating that they were a pretext.

*See also Powell v. Syracuse Univ.*, 580 F.2d 1150 (2d Cir. 1978), *cert. denied*, 439 U.S. 984, 99 S.Ct. 576, 58 L.Ed.2d 656 (1978) (university's argument that the plaintiff's academic performance was deficient and her academic credentials inadequate was not a pretext for discrimination); *Campbell v. Ramsay*, 484 F.Supp. 190 (E.D.Ark. 1980) (refusal to reappoint because a professor had not earned a Ph.D. was not a pretext for discrimination); *Johnson v. Univ. of Pittsburgh*, 435 F.Supp. 1328 (W.D.Pa. 1977) (among the reasons for not promoting a biochemistry professor was that her research was in an area unrelated to the interests and goals of the department). *See generally, Joshi v. Florida State Univ.*, 486 F.Supp. 86 (N.D.Fla. 1980).

**23.** While we are mindful that Smith was the first and only fulltime professor that the Department had employed, we, in assessing the significance of that fact, must also bear in mind that Department had but 10 fulltime faculty members and, on a nationwide basis during the early 1970s, only 5–8% of the Ph.D.'s in religion were women. Therefore, applying a strict statistical analysis, a Department the size of the one at the University would not be expected to have more than one female fulltime professor of religion in 1974.

**24.** *Compare Sweeney v. Bd. of Trustees of Keene State College*, 604 F.2d 106 (1st Cir. 1979), *cert. denied*, 444 U.S. 1045, 100 S.Ct. 733, 62 L.Ed.2d 731 (1980) (plaintiff had already received tenure and there was evidence that she was as qualified as those professors who had been promoted). *See generally, Patino v. Dallas Independent School Dist.*, 486 F.Supp. 226 (N.D.Tex. 1980).

members to make. Tenure is one of the most difficult of all academic decisions. "[T]enure is a privilege, an honor, a distinctive honor, which is not to be accorded to all ... professors. It is a very high recognition of merit [and] the ultimate reward for ... academic excellence. It is to be awarded in the course of search for fundamental merit." *Johnson v. University of Pittsburgh*, 435 F.Supp. 1328, 1353 (W.D.Pa. 1977). It is a decision which, in addition to delineating basic qualifications, involves a degree of subjectivity.[25] Furthermore, since professors are individuals and perform different roles within a department, it is difficult to compare the reasons for promoting one faculty member with the reasons for promoting or not promoting another.

Recognizing that such problems exist, we think it merits mention, so as to allay any doubts that Dr. Smith may harbor, that, even if we were to assume *arguendo* that she had established a prima facie case of discrimination in the decision not to promote and grant tenure, we still would be forced to conclude that the University had shown a sufficient nondiscriminatory reason for its decision. *See general-*ly, *Cussler v. University of Maryland*, 430 F.Supp. 602, 606–07 (D.Md. 1977). The same reasons which supported the University's decision not to reappoint justify its decision not promote and grant tenure. While we recognize that the decisions involve two distinct determinations, we also must be realistic and acknowledge that if a university has justified why a professor should not be reappointed, it would verge on the absurd to hold that it had not substantiated reasons why it need not take the more serious step of promoting her and granting her tenure.

### C. Conclusion

University employment cases have always created a decisional dilemma for the courts. *See generally*, Runyan, *Employment Decision–Making in Educational Institutions*, 26 Wayne L.Rev. 955 (1980). Unsure how to evaluate the requirements for appointment, reappointment and tenure, and reluctant to interfere with the subjective and scholarly judgments which are involved, the courts have refused to impose their judgment as to whether the aggrieved academician should have been awarded the desired appointment or promotion.[26] Rath-

---

**25.** Even Appellant would not insist on the full elimination of all subjectivity in an area where difficult and erudite value judgments, related to the academic experience of a lifetime of the person making or assisting in making the reappointment or promotion decisions are inescapably involved. At page 40 of her Brief she states: "We do not claim that subjective standards may never be used in promotion cases in management or academic jobs ...." Her complaint is only that objective evaluations were excluded in the judgmental process. But the asserted objective materials were made available to the factfinder. Her complaint is simply that she did not obtain the result she would have preferred, *i. e.*, that the factfinder did not see things in the same light, or accord them the same weight. The plaintiff's argument thus comes down to a jury speech, and at this late appellate stage in the evolution of the case, that is not pertinent.

**26.** This anti–interventionist policy was expressed well in *Faro v. New York University*, 502 F.2d 1229, 1231–32 (2d Cir. 1974) when the court stated:

> Of all fields, which the federal courts should hesitate to invade and take over, edu-cation and faculty appointments at a University level are probably the least suited for federal court supervision. Dr. Faro would remove any subjective judgments by her faculty colleagues in the decision–making process by having the courts examine 'the university's recruitment, compensation, promotion and termination and by analyzing the way these procedures are applied to the claimant personally' .... Such a procedure, in effect, would require a faculty committee charged with recommending or withholding advancements or tenure appointments to subject itself to a court inquiry at the behest of unsuccessful and disgruntled candidates as to why the unsuccessful was not as well qualified as the successful.

It is true, as the Second Circuit later cautioned in *Powell v. Syracuse University*, 580 F.2d 1150, 1153 (2d Cir. 1978), *cert. denied*, 439 U.S. 984, 99 S.Ct. 576, 58 L.Ed.2d 656 (1978), that there are limits to *Faro*. *Faro* does not stand "for the broad proposition that courts should exercise minimal scrutiny of college and university employment practices" or that "colleges and universities [are] virtually immune to charges of employment bias" but only that

er, the courts review has been narrowly directed as to whether the appointment or promotion was denied because of a discriminatory reason. *See Sweeney v. Board of Trustees of Keene State College*, 604 F.2d 106, 112 (1st Cir. 1979), *cert. denied*, 444 U.S. 1045, 100 S.Ct. 733, 62 L.Ed.2d 731 (1980). "[T]he law does not require, in the first instance, that employment be rational, wise, or well–considered–only that it be nondiscriminatory." *Powell v. Syracuse University*, 580 F.2d 1150, 1156–57 (2d Cir. 1978), *cert. denied*, 439 U.S. 984, 99 S.Ct. 576, 58 L.Ed.2d 656 (1978). We conclude that the district court had ample foundation for its determination that the University's decisions were not discriminatory.

### IV. *The Award of Attorney's Fees.*

It thus eventuates that Smith's efforts to succeed on the merits have altogether failed. On none of her claims has she ultimately obtained what she sought. The only result favorable to her has been the prolongation of her employment as a result of the preliminary injunction which, as originally entered, was to be effective until the case had been decided on the merits.[27] The trial court determined that she had, in that respect and to that extent, prevailed and so

awarded her attorney's fees of $8,300 and other litigation expenses of $302.06 for the efforts devoted to securing the injunctive relief.

The award was made pursuant to 42 U.S.C. § 2000e–5(k), the attorney's fee provision of Title VII which provides:

> In any action or proceeding under this subchapter the court, in its discretion, may allow the prevailing party . . . a reasonable attorney's fee as part of the costs . . . .

The question simply becomes, therefore: Did the plaintiff "prevail" in obtaining the preliminary injunction?[28] Compelled by the authorities, we hold that she did not, and that the award of counsel fees and related costs should be reversed.

As we comprehend the rule, to "prevail" a party must establish in an enduring way that he or she was right on a matter in issue and that the litigation activities served to establish the existence of the right or contributed to an enjoyment of the right. There need not be a formal adjudication in the party's favor; a vindication of rights obtained by a settlement or consent

---

"courts must be ever–mindful of relative institutional competences," when assessing whether discrimination was practiced.

Because discrimination, on grounds of age, sex, and religion, was claimed by Smith, there was a basis for judicial review of the University's non–reappointment and non–promotion decisions. Otherwise there would have been none. "We, therefore, refuse to embark upon a comparative inquiry under an equal protection claim into either the quantity or the quality of the published scholarly contributions of the University's faculty members who have been granted or denied promotion, holding that the determination of such matters by the appropriate University authorities is not reviewable in federal court on any ground other than racial or sex discrimination or a First Amendment violation." *Clark v. Whiting*, 607 F.2d 634, 641 (4th Cir. 1979).

That there is judicial review where discrimination on the basis of age, sex, and religion has been asserted does not mean, however, that a finding of discrimination is automatic. We do not veer wildly from a rule of no review in an employer's favor, to one of indisputable and inevitable liability in favor of the employee just because she is a member of a disadvantaged

class, as to which on some occasions, in some locations discrimination has been practiced. The customary professional questions as to proficiency still remain the province of the educational institutions. Only when age or sex or religion has been shown, in such a case as that brought by Smith, to have been a determinative factor in the decision against her do we intervene.

The record fully permitted the conclusion that valid proficiency or suitability considerations alone led to the decisions not to reappoint or promote and that discrimination played no part. There thus remains no scope for a reversal by us.

**27.** After the injunction was granted, Smith accepted another teaching position. The parties then entered a stipulation dissolving the injunction.

**28.** *See generally Thomas v. J. C. Penney Co.*, 531 F.2d 270, 271 (5th Cir. 1976); *Parmer v. National Cash Register Co.*, 503 F.2d 275, 277 (6th Cir. 1974); *Williams v. General Foods Corp.*, 492 F.2d 399, 408–09 (7th Cir. 1974).

judgment[29] may be sufficient as may a showing that the plaintiff's actions were a catalyst which caused the defendant to remedy his errant ways.[30] However, what always must occur is the establishment of a right or the proscription of a wrong.

Neither took place here. The temporary injunction was designed only to preserve the status quo, until resolution on the merits could be obtained. It was designed to increase the likelihood that neither party would be deprived, through change of circumstances, of an opportunity to have her or its fair day in court. The University was deemed better able to weather, without serious adverse consequences, the inconvenience of retaining on its payroll someone it wished to terminate, than could Smith survive dismissal while a case was pending in which she had hopes of obtaining an order that she not be discharged. At the most the preliminary injunction hearing involved a prognosis of probable or possible success. It in no way sought to announce or establish a final result.

The interpretation of the term "prevailing party" is not directly aided by reference to the sparse legislative history, which does, nevertheless, render assistance by emphasizing what the two predominant goals of the statute were. First, since the Senate was shifting responsibility for enforcing Title VII from the EEOC to private individu-als the first purpose was to facilitate the bringing of meritorious suits by persons of limited means; and the second goal was "to deter the bringing of lawsuits without foundation" by providing that either side, if it prevailed, could receive attorney's fees. *See New York Gaslight Club, Inc. v. Carey*, —— U.S. ——, ——————, 100 S.Ct. 2024, 2031, 64 L.Ed.2d 723 (1980); *Grubbs v. Butz*, 548 F.2d 973, 975 (D.C. Cir. 1976).

It is, of course, more difficult for a prevailing defendant than for a prevailing plaintiff to obtain an award. *Christiansburg Garment Co. v. EEOC*, 434 U.S. 412, 418, 98 S.Ct. 694, 698, 54 L.Ed.2d 648 (1978). Nevertheless, the ingredient of a right vindicated or a wrong proscribed is a necessity for a plaintiff's claim to mature. "In order to be a 'prevailing party,' a plaintiff must have been entitled to some form of relief at the time suit was brought." *Harrington v. Vandalia–Butler Board of Education*, 585 F.2d 192, 197 (6th Cir. 1978), *cert. denied*, 441 U.S. 932, 99 S.Ct. 2053, 60 L.Ed.2d 660 (1979). For example, in *Harrington*, the district court, having found that the employer committed sex discrimination against a female employee by providing her different working conditions, awarded the plaintiff compensatory damages and attorney's fees. On appeal, the court held that the compensatory damages were not authorized by Title VII. Because the plaintiff was not

---

**29.** *See Maher v. Gagne*, —— U.S. ——, ——, 100 S.Ct. 2570, 2575, 65 L.Ed.2d 653 (1980) ("[t]he fact that respondent prevailed through a settlement rather than through litigation does not weaken her claim to fees"); *Bonnes v. Long*, 599 F.2d 1316, 1318–19 (4th Cir. 1979) (that litigation resulted in a consent judgment does not preclude a plaintiff from being a prevailing party). *But see Brown v. Boorstin*, 471 F.Supp. 56, 58 (D.D.C. 1978) (plaintiff not a prevailing party when court–approved settlement did not reflect discrimination or concede discrimination by the defendant).

**30.** *See Bly v. McLeod*, 605 F.2d 134, 137–38 (4th Cir. 1979), *cert. denied*, 445 U.S. 928, 100 S.Ct. 1315, 63 L.Ed.2d 761 (1980). *Cf. Oldham v. Ehrlich*, 617 F.2d 163, 168 n.8 (8th Cir. 1980) (plaintiffs entitled to attorney's fees under § 1988 when the state's abandonment of its challenged regulation was a direct result of their action). In *Westfall v. Board of Comm'rs of Clayton County*, 477 F.Supp. 862, 868 (N.D.Ga. 1979), the court stated:

> [I]t appears to the court that plaintiff is clearly a prevailing party with respect to the original complaint in this case. Defendants do not contest that their enactment of the present ordinance was a direct result of the filing of plaintiff's complaint; nor could they seriously do so in light of the events which occurred subsequent to filing. While no order with respect to the original complaint was ever entered, that fact is not controlling .... Instead, defendants' actions in response to this suit are determinative. In addition, the controversy with respect to the original attack on defendants' regulation of solicitation has concluded; nothing further remains to be done or could be done in that phase of this case. Accordingly, the court concludes that plaintiff is a prevailing party as to the initial phase of this litigation and is entitled to the interim award requested.

entitled to relief under the statute, the court concluded that she was not a prevailing party and thus not entitled to attorney's fees. The determination of discrimination, standing alone, in the absence of a remedy, did not suffice to render her a prevailing party. *Id.* at 197–98. The *Harrington* case is clearly one that goes even further than we are required to go in the present case, since here neither a finding of discrimination nor an award of damages has been made. Put otherwise, there must be a finding of liability which settles some aspect of the controversy.[31]

Smith's arguments favoring award of attorney's fees rely predominantly upon *Van Hoomissen v. Xerox Corp.*, 503 F.2d 1131 (9th Cir. 1974). In *Van Hoomissen*, an employee sued its employer, the Xerox Corporation, alleging that he was terminated in retaliation for his efforts to recruit minorities. The EEOC sought to intervene on *two* grounds. It agreed with the employee that Xerox had violated Title VII by retaliating against him but it also asserted that the company was guilty of engaging in discriminatory hiring practices. The district court permitted intervention only as to the issue of retaliation. The EEOC appealed the denial of intervention on the discriminatory hiring practices claim. That was the issue the employee had not raised. The Court of Appeals dismissed the appeal. Thereafter, before the retaliation claim was decided but following final disposition of the discriminatory hiring practices claim, Xerox petitioned the court for attorney's fees incurred in defending the denial of the intervention claim on appeal. The issue presented for

the court's resolution was whether Xerox, which had been successful in the interlocutory appeal, was a prevailing party considering that it eventually might lose the principal case on the issue remaining open. In concluding that attorney's fees were appropriate, the court held:

> We agree that litigation should not be dissected to the point that the losing party be permitted to recover attorney's fees connected with every procedural motion on which it prevails. But this interlocutory appeal is sufficiently significant and discrete to be treated as a separate unit.

*Id.* at 1133.

In construing *Van Hoomissen*, the district court stated:

> [T]he correct interpretation of the *Van Hoomissen* rule would appear to be ...: that the term 'prevailing party' includes a party who has prevailed on a procedural motion that is sufficiently significant and discrete to be treated as a separate unit. Of course, in applying the rule, 'litigation should not be dissected to the point that the losing party be permitted to recover attorney's fees connected with every procedural motion on which it prevails.'

Purporting to apply the rule enunciated in *Van Hoomissen*, the district court held that:

> [A] preliminary injunction is a sufficiently significant and discrete proceeding that a party who prevails on the motion can be considered a 'prevailing party' eligible for attorney's fees under § 2000e–5(k). The Court notes that a preliminary injunction is an extraordinary remedy designed to prevent irreparable injury to

---

**31.** Although to prevail, a party must establish liability, to satisfy the finality requirement he need not show that nothing else remains to be done in the proceeding. For example, in *Nicodemus v. Chrysler Corp.–Toledo Machining Plant*, 445 F.Supp. 559, 560 (N.D.Ohio 1977), plaintiffs in a class action who had established discrimination were awarded interim attorney's fees prior to determination of the extent of individual relief. Posting a bond was required in case the defendants should prevail on appeal. To like effect is *James v. Stockham Valves and Fittings Co.*, 559 F.2d 310, 358–59 (5th Cir. 1977), *cert. denied*, 434 U.S. 1034, 98 S.Ct. 767, 54 L.Ed.2d 781 (1978).

*See also Wharton v. Knefel*, 562 F.2d 550, 556–58 (8th Cir. 1977) (employee, who convinced appellate court that district court's finding that he was not a victim of racial discrimination was clearly erroneous, was entitled to attorney's fees for the appellate phase of the case even though the case was remanded to the district court to consider damages, injunctive relief, and an award of attorney's fees for proceedings before it).

It is to be emphasized that in each of the cases there was a determination that rights of the plaintiff or plaintiffs had been invaded by the defendants.

parties pending the outcome of the litigation.... The decision to grant or deny a preliminary injunction often determines in a practical sense the course and outcome of a particular case. The significance and discreteness of a preliminary injunction decision is also reflected in the fact that it is one of the few decisions for which an interlocutory appeal of right is provided. *See* 28 U.S.C. § 1292(a). Thus a party who prevails on the preliminary injunction motion is a 'prevailing party' eligible for attorney's fees under § 2000e–5(k).

▋ The district court erred in fashioning a rule which depended solely on whether the label "preliminary injunction" attached, instead of looking to the appropriate and determining question of whether there had been a final disposition in favor of the party claiming that it had prevailed.

As noted by the District of Columbia Circuit, the holding in *Van Hoomissen* should properly be interpreted in the more narrow sense:

Read broadly, *Van Hoomisen* [sic] approves fee awards in connection with 'significant and discrete' interlocutory appeals ...; read narrowly, it approves awards only when an interlocutory appeal results in a final resolution of a separable dispute (the claim of discriminatory hiring).

*Grubbs v. Butz*, 548 F.2d 973, 974–75 n.5 (D.C. Cir. 1976).

Other cases like *Van Hoomissen*, which at first glance seem supportive of Smith's position, are, upon examination, distinguishable. For example, in *Smallwood v. National Can Co.*, 583 F.2d 419 (9th Cir. 1978), the plaintiff joined his employer and union in his complaint, suing the former for racial discrimination and the latter for retaliation by denying him reinstatement in the union. The court held a separate hearing on the retaliation claim against the union. From the evidence adduced it concluded that the union had violated 42 U.S.C. § 2000e–3(a) by acting with retaliatory intent. To restrain the union from denying the plaintiff reinstatement and to protect him against further retaliation, the court issued a permanent injunction. It also awarded attorney's fees to the plaintiff, representing the costs incurred in obtaining the injunction. The union appealed. At the time of the appeal the discrimination claims against the employer had not been adjudicated.

With respect to the propriety of granting attorney's fees, the court upheld the district court's award. It held that the employee was a prevailing party since "the attorney's efforts [in the injunction proceedings] were 'sufficiently significant and discrete to be treated as a separate unit' ...." *Id.* at 421. A superficial analysis of this opinion would lead one to the general conclusion that attorney's fees are proper when one succeeds in obtaining a preliminary injunction. Yet, a closer examination reveals that, as to the union, once a finding of unlawful retaliation was made and the injunction was ordered, a final result had been reached, and, as against the union, the action was effectively terminated. Smith's case, however, is significantly different. No issue was disposed of as a consequence of the grant of a temporary injunction. To the contrary, the possibility that the University would be found not to have discriminated continued to exist, and, after the hearing on the merits, it was determined that the University had not discriminated, and that thus Smith would not prevail.

Similarly distinguishable is *Kimbrough v. Arkansas Activities Assoc.*, 574 F.2d 423, 426 (8th Cir. 1978), where an injunction was deemed to the district court to justify a claim for attorney's fees since "it effectively disposed of the case." *Id.* at 425. The Eighth Circuit upheld the district court's award of attorney's fees because the relief granted was "part of a final, appealable order which terminated the controversy." *Id.* at 426.

To like effect is *Lea v. Cone Mills Corp.*, 438 F.2d 86 (4th Cir. 1971). In *Lea*, the court found that the defendant had committed an unlawful employment practice by refusing to employ black females. The court issued an injunction, enjoining the defendant from further discriminatory action and ordering compliance with its order.

A case illustrative of the controlling considerations is *Grubbs v. Butz*, 548 F.2d 973 (D.C.Cir. 1976). It discusses the propriety of granting attorney's fees for an interlocutory appeal when the discrimination issues have not yet been addressed. There the plaintiff alleged that the Department of Agriculture discriminated against her because of her sex and had subjected her to reprisals for a complaint she had filed with the Department two years earlier. After granting her a temporary restraining order, the district court later denied her request for a preliminary injunction enjoining the separate proceedings in the Department, ruling that she would have to exhaust her administrative remedies before the district court would address the issues. On appeal, the court affirmed the denial of the injunction but held that exhaustion was not required since the court and the Department could exercise concurrent jurisdiction over the case. Having obtained a partially favorable ruling on appeal as to the exhaustion issue, the plaintiff, prior to a trial on her claims, petitioned the court for attorney's fees. The court denied the plaintiff's request on the grounds that it was premature. While it was true that, in the traditional sense, she had succeeded on the interlocutory appeal, she, nonetheless, was not a prevailing party within the meaning of section 2000e–5(k). At that stage of the proceedings there was no ruling on the merits of her discrimination claim. The court persuasively expressed its views in the following language:

Since Congress was solicitous enough of the rights of innocent Title VII defendants to authorize awards of attorneys' fees in their favor, we cannot believe Congress would have countenanced assessing fees against a defendant absent any showing of discrimination. For all we now know, the defendants in this case may be entirely blameless. If attorneys' fees were assessed against them at this point in the litigation, the ultimately successful party might end up having subsidized a large segment of the losing party's suit against him. While that prospect might be consonant with the goals of a statute authorizing fee awards to any party, we find it contrary to the purposes of one that provides for awards only to the party who prevails. It follows that since Ms. Grubbs has yet to demonstrate discrimination, an award of counsel fees would be inappropriate at this time.

In reaching this conclusion, we in no way imply that an interim fee award would be inappropriate if the losing party had 'acted in bad faith, vexatiously, wantonly, or for oppressive reasons ....' Nor do we denigrate the propriety of an interim award once discrimination has been established.

*Id.* at 976–77.

▅ Patterned after 42 U.S.C. § 2000e–5(k), the standards for an award of attorney's fees under 42 U.S.C. § 1988 are generally the same as those applicable to cases of asserted discrimination on the basis of race, sex, religion, national origin, or age. *See Bonnes v. Long*, 599 F.2d 1316, 1318 n. 2 (4th Cir. 1979); *Harrington v. Vandalia–Butler Board of Education*, 585 F.2d 192, 198 n. 5 (6th Cir. 1978), *cert. denied*, 441 U.S. 932, 99 S.Ct. 2053, 60 L.Ed.2d 2053 (1979); *Westfall v. Board of Comm'rs of Clayton County*, 477 F.Supp. 862, 868 (N.D. Ga.1979). *See generally* Note, *Promoting the Vindication of Civil Rights Through the Attorney's Fee Award Act*, 80 Colum.L.Rev. 346 (1980). The operative words in cases under § 1988 are again "prevailing party." Thus, a comparison of cases discussing the propriety of interim awards under § 1988 may be illuminating.

In *Hanrahan v. Hampton*, —— U.S. ——, 100 S.Ct. 1987, 64 L.Ed.2d 670 (1980), the Supreme Court held that the plaintiffs were not prevailing parties despite their success in obtaining: reversals of directed verdicts as to some of the respondents; a reversal of denial of a motion to discover; and an instruction to the district court on remand to consider permitting further discovery and perhaps the imposition of sanctions for noncompliance with prior discovery orders. The court pertinently observed that:

The legislative history of the Civil Rights Attorney's Fees Awards Act of

1976 indicates that a person may in some circumstances be a 'prevailing party' without having obtained a favorable 'final judgment following a full trial on the merits.' H.R.Rep. No. 94–1558, 94th Cong., 2d Sess., 7 (1976). See also S.Rep. No. 94–1101, 94th Cong., 2d Sess., 5 (1976). Thus, for example, 'parties may be considered to have prevailed when they vindicate rights through a consent judgment or without formally obtaining relief,' S.Rep. No. 94–1101, supra, at 7. See also H.R.Rep. No. 94–1558, supra, at 7, and cases cited; *Dawson v. Pastrick*, 600 F.2d 70, 78 (CA8 1979); *Nadeau v. Helgemoe*, 581 F.2d 275, 279–281 (CA1 1978).

It is evident also that Congress contemplated the award of fees pendente lite in some cases. S.Rep. No. 94–1011, supra, at 5; H.R.Rep. No. 94–1558, supra, at 7–8. But it seems clearly to have been the intent of Congress to permit such an interlocutory award *only to a party who has established his entitlement to some relief on the merits of his claims, either in the trial court or on appeal.* The Congressional Committee Reports described what were considered to be appropriate circumstances for such an award by reference to two cases—*Bradley v. Richmond School Board*, 416 U.S. 696, 94 S.Ct. 2006, 40 L.Ed.2d 476, and *Mills v. Electric Auto–Lite Co.*, 396 U.S. 375, 90 S.Ct. 616, 24 L.Ed.2d 593. S.Rep. No. 94–1011, supra, at 5; H.R.Rep. No. 94–1558, supra, at 8. In each of those cases the party to whom fees were awarded *had established the liability of the opposing party,* although final remedial orders had not been entered. The House Committee Report, moreover, approved the standard suggested by this Court in *Bradley,* that 'the entry of any order that determines substantial rights of the parties may be an appropriate occasion upon which to consider the propriety of an award of counsel fees . . .,' H.R.Rep. No. 94–1558, supra, at 8, quoting *Bradley v. Richmond School Board*, supra, at 722, n. 28. Similarly, the Senate Committee Report explained that the award of counsel fees

pendente lite would be 'especially appropriate where a party has prevailed on an important matter in the course of the litigation, even when he ultimately does not prevail on *all* issues.' S.Rep. No. 94–1101, supra, at 5 (emphasis by the Court). It seems apparent from these passages that Congress intended to permit the interim award of counsel fees only when a party *has prevailed on the merits* of at least some of his claims. For only in that event has there been a determination of the 'substantial rights of the parties,' which Congress determined was a necessary foundation for departing from the usual rule in this country that each party is to bear the expense of his own attorney. (Emphasis added.)

*Id.* at ——, 100 S.Ct. at 1989.

In ruling against the award of attorney's fees, the Supreme Court cited with approval *Bly v. McLeod*, 605 F.2d 134 (4th Cir. 1979), *cert. denied*, 445 U.S. 928, 100 S.Ct. 1315, 63 L.Ed.2d 761 (1980). *Id.*, —— U.S. at —— n. 4, 100 S.Ct. at 1989 n. 4. There we were examining whether a litigant was a prevailing party within the meaning of the attorney's fee provision of the Voting Rights Act, 42 U.S.C. § 1973*l*(e) and the Civil Rights Attorneys' Fees Awards Act of 1976, 42 U.S.C. § 1988. From the holding in *Hanrahan v. Hampton*, —— U.S. at —— n. 4, 100 S.Ct. at 1989 n. 4, it is evident that the definition of the term "prevailing party" was to be deemed identical for 42 U.S.C. § 1973*l*(e), § 1988, and § 2000e–5(k):

The provision for counsel fees in § 1988 was patterned upon the attorneys' fees provisions contained in Titles II and VII of the Civil Rights Act of 1964; 42 U.S.C. §§ 2000a–3(b) and 2000e–5(k), and Section 402 of the Voting Rights Act Amendments of 1975, 42 U.S.C. 1731(e). S.Rep. No. 94–1101, supra, at 2; H.R.Rep. No. 94–1558, supra, at 5. Those provisions have been construed by the Courts of Appeals to permit the award of counsel fees only to a party who has prevailed on the merits of a claim. See *Bly v. McLeod*, 605 F.2d 134, 137 (CA4 1979) . . . .

The plaintiffs in *Bly* claimed to be entitled to attorney's fees because they obtained: a

temporary injunction which enabled them to vote; an earlier remand to permit clarification of the record; and the empaneling of a three–judge district court. We rejected the contention that the plaintiffs were prevailing parties:

> The granting of a temporary restraining order in the situation presented here was in no way a determination on the merits and merely preserved the status quo when the plaintiffs might be irreparably harmed if temporary relief were not granted. ... [T]he granting of the temporary restraining order hardly can be said to constitute generally prevailing on the merits. No adjudication of invalidity of the statute was made. ...

Plaintiffs fare no better with their other two arguments. Our decision to vacate and remand the first dismissal of this case expressly stated that we expressed no opinion on the merits, but that we remanded for clarification of the basis for the district court's decision. Likewise, we do not see how the mere constitution of a three–judge district court can be said to make plaintiffs the prevailing parties. It is clear that if the plaintiffs had ultimately lost on the merits that their three examples of procedural success would not entitle them to an award of attorneys' fees. Neither the district court nor any other court has ever held the statute in question invalid. In order to recover attorneys' fees and costs, plaintiffs must show at least some success on the merits. They simply have not done so.

· · · · ·

The subject matter of the present question has just been considered by us in the case of *Bonnes v. Long*, 599 F.2d 1316 (4th Cir. 1979), a claim under the Civil Rights Attorneys' Fees Awards Act of 1976, 42 U.S.C. § 1988. §§ 1973*l*(e) and 1988 are phrased in identical terms, and we apply the same rule of decision under both of them.

*Id.* at 137–38.

The plaintiffs in *Planned Parenthood of Minnesota, Inc. v. Citizens for Community Action*, 558 F.2d 861 (8th Cir. 1977), challenged the constitutionality of a zoning ordinance. Believing that the case raised serious constitutional questions, the district court granted injunctive relief. Prior to an adjudication on the merits, the plaintiffs sought attorney's fees under section 1988. The Eighth Circuit denied the request stating:

> The judicial finding that the ordinance is probably unconstitutional is derived from exhibits and affidavits presently appearing in the record. The issues of whether or not the ordinance is actually unconstitutional and whether or not these public officials are subject to monetary damages await a plenary trial and an amplification of the present record. At this embryonic stage of the litigation, it would be inequitable to shackle these officials with a sizable award of attorney's fees. This matter of attorney's fees should be considered by the District Court as the proceedings advance to a more mature stage.

*Id.* at 871.

Thus, as all the cases indicate, to receive attorney's fees allowed by statute to the prevailing party, a party must prevail on the merits of at least some of his claims. Smith clearly failed to prevail on the merits on any claim whatever. There are recognized circumstances, such as the instant case, where the protective policies supporting an injunction make its issuance proper regardless of the ultimate outcome of the suit. However, just because an injunction was issued properly does not signify that a defendant must incur the costs of its issuance when a court has eventually proclaimed him to be innocent of discriminatory conduct. While we recognize that the attorney's fees provision was designed to encourage plaintiffs of limited means to bring meritorious lawsuits, nonetheless, in the end, it was determined that Smith's suit was not meritorious. We find it incongruous to assume that Congress intended a defendant to finance a preliminary injunction, issued solely on a belief, reasonable at

the time, yet ultimately established to have been erroneous, that the defendant might have been guilty of discrimination, and on the defendant's comparatively better condition to stand a preliminary yet wholly revisable conclusion that the defendant probably discriminated than the plaintiff could endure a contrary preliminary but non–binding conclusion. When later a court held the defendant finally to be innocent of the suspected discrimination, and determined that the plaintiff had received the benefits of the preliminary injunction not because of the merits of her cause but for other reasons related to the justice of affording as much as possible every individual a full opportunity to litigate a claim, there is no foundation for a conclusion that the plaintiff ever prevailed. If we were to hold otherwise, we essentially would be requiring a defendant, who prevailed on the merits, to finance a plaintiff's unsuccessful claim against him. There is nothing in the statute to suggest that an innocent defendant should be assessed a portion of a plaintiff's litigation costs.

Litigation is not without its financial risks. A fully successful defendant should not be required to reimburse an unsuccessful plaintiff for his legal gamble. The attorney's fees provision was intended to assist those plaintiffs who were successful in prosecuting suspected violators of Title VII, not those who were not.

Having carefully examined the issue, we are convinced that we must reverse the attorney's fees award.

*JUDGMENTS AGAINST THE APPELLANT ARE AFFIRMED; THE AWARD OF ATTORNEY'S FEES AGAINST THE APPELLEES IS REVERSED.*